**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

TYLER COPELAND,                    )
                                   )
                Plaintiff,         ) CIVIL ACTION NO.:
                                   )
         vs.                       ) 6:20-cv-057-RSB-CLR
                                   )
GEORGIA DEPARTMENT OF              )
CORRECTIONS,                       )
                                   )
_____Defendant._____ )


VIDEOCONFERENCE DEPOSITION OF

TYLER COPELAND



1:04 p.m.


August 23, 2021


Cooper Barton & Cooper
170 College Street
Macon, Georgia



Annette Pacheco, RPR, RMR, CCR-B-2153

## Gilbert & Jones

— Certified Court Reporters —

P. O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520

gilbertandjones1@gmail.com
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
Savannah, GA 31406

2

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

        KENNETH E. BARTON, III, Esq.
            (By videoconference)
        COOPER BARTON & COOPER, LLP
        170 College Street
        Macon, Georgia  31201
        478-841-9007
        keb@cooperbarton.com


On behalf of the Defendant:

        G. TODD CARTER, Esq. (By videoconference)
        BROWN READDICK BUMGARTNER CARTER STIRCKLAND &
            WATKINS, LLP
        5 Glynn Avenue
        P.O. Box 220 (31521-0220)
        Brunswick, Georgia  31520
        912-264-8544
        tcarter@brbscw.cm


                        - - -

3

## INDEX TO EXAMINATIONS

Examination                                              Page


Examination by Mr. Carter                                  4

Examination by Mr. Barton                                 76

Examination by Mr. Carter                                 87

- - -

## INDEX TO EXHIBITS

Defendant's
  Exhibit              Description                    Page

Exhibit 1        Statewide Sexual Harassment
                 Prevention Policy                      4

Exhibit 2        List of harassment incidents           4

     (Original Exhibits 1 and 2 have been attached to
the original transcript.)

4

1          (Reporter disclosure made pursuant to

2       Article 10.B of the Rules and Regulations of the

3       Board of Court Reporting of the Judicial Council

4       of Georgia.)

5          (Defendant's Exhibits 1 and 2 were marked

6       for identification.)

7                    TYLER COPELAND,

8  having been first duly sworn, was examined and

9  testified as follows:

10                     EXAMINATION

11       MR. CARTER:  Okay.  This will be the

12       deposition of Tyler Copeland taken pursuant to

13       notice and agreement of counsel.

14          Ken, if it's agreeable, we will reserve

15       objections except as to the form of question,

16       responsiveness of the answer until further use.

17          MR. BARTON:  That's fine with us.

18          MR. CARTER:  Just let it be governed by

19       the Federal Rules of Civil Procedure.

20  BY MR. CARTER:

21     Q.    Good morning -- or good afternoon,

22  Mr. Copeland.  My name's Todd Carter.  I represent

23  the Department of Corrections in this lawsuit that

24  you have filed.

25          Have you ever been deposed before?

5

1          A.     No, sir.

2          Q.     Okay.  Just a little background to help us

3     out here.  The court reporter, who you can see, is

4     taking down everything we say.  So it's important for

5     me to finish my question before you answer and for me

6     to let you finish your answer before I ask another

7     question so we don't talk over each other.  Is that

8     agreeable?

9          A.     Understood.

10          Q.     And we all do it, but if we can limit the

11     uh-huhs or huh-uhs because she can't tell all the

12     time what we're trying to say, if that's agreeable as

13     well.

14          A.     Yes, sir.

15          Q.     And if you need -- I don't anticipate this

16     is going take, you know, all afternoon or anything,

17     but if you need a break at any time, let me know.

18     We'll take a break.  The only thing I would ask is

19     that you answer the question that is out there before

20     we do that, if that's okay.

21          A.     Yes, sir.

22          Q.     Okay.  Give me your full name,

23     Mr. Copeland.

24          A.     Tyler McKenzie Copeland.

25          Q.     And what's your date of birth?

6

1      A.      Redacted .

2      Q.      So you are 29, if my math is correct?

3      A.      Yes, sir.

4      Q.      Okay.  Where do you currently live?

5      A.      Statesboro, Georgia.

6      Q.      And what's the address there?

7      A.      6023 Virginia Pine Avenue.

8      Q.      Do you live with anyone or do you live by

9  yourself?

10     A.      I live with two other individuals.

11     Q.      Okay.  What are their names, please?

12     A.      Katie Carter and Redacted Anderson.

13     Q.      Kate Carter and Redacted Anderson?

14     A.      Katie.

15     Q.      Katie?  Okay.  And Redacted Anderson.  All

16 right.  And y'all, I guess, share a house or

17 apartment?

18     A.      A house.

19     Q.      Are they employees of the Department of

20 Corrections?

21     A.      No, sir.

22     Q.      Okay.  And are they relatives or just

23 friends?

24     A.      It's my girlfriend.

25     Q.      Girlfriend?

7

1      A.      Yeah.

2      Q.      Okay.  And that would be Katie?

3      A.      Yes, sir.

4      Q.      And what about Redacted?

5      A.      That's her son.

6      Q.      Okay.  How old is Redacted?

7      A.      Four.

8      Q.      What does Katie do?  Does she work?

9      A.      Yes.  She works -- she was a previous

10  employee of the Department of Corrections, and she

11  currently works for the Georgia Department of

12  Community Supervision.

13     Q.      Department of Community Supervision?

14     A.      Yes, sir.

15     Q.      What does she do there?

16     A.      She's an admin. -- admin. support.

17     Q.      Okay.  All right.  But y'all aren't

18  legally married or anything?  Just boyfriend and

19  girlfriend?

20     A.      Yes, sir.  That's correct.

21     Q.      Do you have any relatives in Bulloch

22  County?

23     A.      No, sir, I do not.

24     Q.      I'm going to read off the names of some

25  other counties and ask you if you have any relatives

8

1    there.  And the purpose of this is simply covers

2    where the jury pool would be pulled from if we have

3    to try this case.  Candler?  Emanuel?  Evans?

4    Jenkins?  Screven?  Tattnall?  And Toombs?

5         A.    No, sir.  I do not have any family in

6    those counties.  I'm originally from Michigan.

7         Q.    Okay.  All right.  That'll lead me into my

8    next line of questions.  Where were you born?

9         A.    I was born in Escanaba, Michigan, Delta

10   County.

11        Q.    Could you spell that.  I'm sure the court

12   reporter might have a problem.

13        A.    E-s-c-a-n-a-b-a.

14        Q.    Okay.  And are your parents still alive?

15        A.    Yes, sir.

16        Q.    Do they still live in Michigan?

17        A.    My father lives in Chicago, Illinois.  My

18   mother lives in Delta County, Gladstone Michigan,

19   yes.

20        Q.    Okay.  And what do they do for a living?

21        A.    My mother's a home health aide.  She does

22   home health in the medical field.  And my father owns

23   his own business in the power washing industry.

24        Q.    Okay.  Do you have any siblings?

25        A.    I have one brother.

9

1       Q.     And what's his name?  Where does he live?

2       A.     Andrew Dean Frievalt.  He lives in, I want

3   to say Menominee, Michigan.

4       Q.     All right.  And how old is your brother?

5       A.     He's 25.  He just turned 25 this year.

6       Q.     Did you graduate from high school?

7       A.     Yes, sir.  I graduated valedictorian in my

8   high school class.

9       Q.     And what was the high school that you

10  graduated from?

11      A.     James R. Fitzharris High School.  That was

12  in Wells, Michigan.

13      Q.     Wells, Michigan?

14      A.     Yes, sir.

15      Q.     Okay.  Do you have any education above

16  high school?

17      A.     I have a two-year associate's degree and a

18  couple extra semesters.  I have my degree in criminal

19  justice.

20      Q.     Okay.  The two year associate, that was in

21  criminal justice?

22      A.     Yes, sir.  It was through Coastal College

23  of Georgia in Brunswick.

24      Q.     Okay.  And then you said you had a few

25  semesters above that?

1    A.    Yeah.  I have three semesters and I'll

2  have my bachelor's degree, but that's kind of where

3  I'm with that.

4    Q.    That's what?  I'm sorry.  I didn't get

5  that last --

6    A.    That's kind of where I'm at with my, you

7  know, my schooling is I have three semesters to my

8  bachelor's.  So . . .

9    Q.    Do you plan to get a bachelor's?

10   A.    Yes, sir.

11   Q.    Okay.  What brought you to Georgia?

12   A.    I was in the United States military.  I

13  was in the Army.  I was stationed at Fort Stewart.

14   Q.    When did you enlist in the Army?

15   A.    Two thousand and -- 2010.

16   Q.    Okay.  And did you -- you enlisted, I

17  guess, and correct me if I'm wrong, you enlisted when

18  you were still in Michigan?

19   A.    Yes, sir.  That's correct.

20   Q.    And was Fort Stewart where you did your

21  initial training?

22   A.    No.  I did my initial training in Missouri

23  at the Military Police Academy.  And then I was -- my

24  first duty station was Fort Stewart.

25   Q.    Okay.  How long were you in the military?

1    A.    About two -- about -- about two, two and a
2    half years.
3    Q.    Okay.  And were you stationed anywhere
4    other than Fort Stewart?
5    A.    No, sir.
6    Q.    What made you leave the military?
7    A.    I left for medical reasons.
8    Q.    Okay.  And what was the medical reason
9    that you were let out for?
10   A.    I sustained leg injuries during my --
11   during my enlistment.
12   Q.    Okay.  Did the injury occur at Fort
13   Stewart?
14   A.    Yes.
15   Q.    Okay.  Was it a disabling injury or --
16   A.    Yes.
17   Q.    Okay.  Did you lose any part of your leg
18   or --
19   A.    No.
20   Q.    Okay.  Just disabling from further
21   military service is what you said?
22   A.    That's correct.
23   Q.    Okay.  Was it a break?  Laceration?
24   A.    Stress fractures in my legs.
25   Q.    What happened to cause that?

1    A.    Just overuse, training.  I was training to
2    go air assault and, you know, I was running miles at
3    a time with 50 to 80 pounds on my back.  So it tends
4    to break bones if you --
5    Q.    I gotcha.
6    A.    Gotcha.
7    Q.    That was for the training, just during the
8    training, the physical requirements caused the stress
9    fractures.  Is that fair enough?
10   A.    That's correct.
11   Q.    All right.  And were you honorably
12   discharged?  Dishonorably?  Medically?
13   A.    I was honorably medically discharged.
14   Q.    Okay.  All right.  Did you have any kind
15   of claim as a result of that against the Army or the
16   Department of Defense or U.S. government?
17   A.    I was med boarded.  So I was medically
18   discharged.
19   Q.    Okay.  You didn't receive any compensation
20   or anything like that?
21   A.    Yes.  I received a severance package.
22   Q.    What did that include?
23   A.    It was a lump sum of money.  I believe it
24   was $10,000.
25   Q.    Okay.  You don't have any ongoing payments

13

1    from the military or U.S. government?

2         A.    I have received VA benefits.

3         Q.    Okay.  And that's for medical treatment?

4         A.    Yes.

5         Q.    Do you receive any monetary compensation

6    other than the medical benefits?

7         A.    Yes.  I receive a monthly benefit.

8         Q.    And that's a VA disability check?

9         A.    That's correct.

10        Q.    How much is that a month?

11        A.    I believe it was 1826.

12        Q.    $1,826?

13        A.    That's correct.

14        Q.    And is that a lifetime payment?

15        A.    Yes.  I believe so.

16        Q.    Are you a member of -- you say you live in

17   Statesboro.  Are you a member of any churches,

18   religious organizations, groups, anything like that

19   in Statesboro?

20        A.    No, sir, I'm not.

21        Q.    Okay.  Do you attend church regularly?

22        A.    Virtually, yes.

23        Q.    Virtually?  Is it through a church in

24   Statesboro?

25        A.    No, sir.

14

1          Q.    Okay.  All right.  And you're not a member
2    of like Rotary Club, anything like that, in Bulloch
3    County or Statesboro?
4          A.    No, sir.
5          Q.    All right.  How long have you been in
6    Statesboro, Mr. Copeland?
7          A.    I moved to Statesboro in 2019, I believe.
8          Q.    And tell me again what year were you
9    discharged from the military?
10         A.    The spring of 2013.
11         Q.    Okay.  And you went into the military in
12   2010; is that right?
13         A.    My -- I began my applying in 2010.  I
14   wasn't sent until -- to basic training until two
15   thousand -- February of 2011.
16         Q.    Okay.  Now, did you go into the military
17   straight out of high school?
18         A.    Yes, sir, I did.
19         Q.    All right.  So that was your first, I
20   guess, regular employment, so to speak, or career?
21         A.    Yes.  Yes.
22         Q.    All right.  After you left the military in
23   2013, just take me forward from there to the current
24   as to your professional career, where you worked,
25   what your jobs have been.  Just summarize it for me,

1   if you could.

2         A.    Well, prior to the military, I assisted my

3   stepfather in running his plumbing business and drain

4   cleaning business.  I did that while I was in high

5   school up until my enlistment.

6              Once I was enlisted, I went into basic

7   training.  Went to military police school.  Stationed

8   at Fort Stewart.  I was a MP on base.

9              And after the military, I went to college

10  in Brunswick, Coastal College of Georgia.  Obtained

11  my two-year degree.  Went for another semester or

12  two.  And then I started my employment with the

13  Georgia Department of Corrections in the fall of

14  2014.

15             While I was -- while I was going to

16  school, I also did private security with Millennium

17  Security in Brunswick to help get myself through

18  school.

19             In December 2014, I left the Georgia

20  Department of Corrections because I had to attend to

21  some family members back home.  And so I left the

22  department from January 2015 till, I believe it was

23  September 2015.  I came back and obtained my position

24  back at Georgia Department of Corrections at Rogers

25  State Prison.

1    Q.    Okay.

2    A.    And in the spring of 2016, I was selected

3    to be on the Southeast Interdiction Response Team

4    through the Georgia State Prison in southeast region.

5        I was on -- I did that until July 2017.

6    And I was promoted to sergeant at Rogers State

7    Prison.

8    Q.    Okay.

9    A.    Then in April of 2020, I was promoted to

10   lieutenant at Rogers State Prison, and that's

11   currently where I -- that's where I currently reside

12   at.

13   Q.    Okay.  Thank you.  So after, essentially,

14   after high school, your entire career has been first

15   in the military as the police and then as a

16   corrections officer?  Is that --

17   A.    That's correct.

18   Q.    -- your statement?

19        Okay.  What made you go to Coastal here in

20   Brunswick?  Was it the program or family connection

21   down here or something?

22   A.    I was -- my girlfriend at the time was

23   from Brunswick, and that's where her family was from.

24   Q.    Okay.  Who was your girlfriend?

25   A.    Joanie Benjamin.

1        Q.    I'm sorry.  I missed that.

2        A.    Joanie Benjamin.

3        Q.    Joanie Benjamin?

4        A.    Yes.

5        Q.    And was Joanie a police officer?

6        A.    No, sir.

7        Q.    Okay.  Do you know if she's still in

8   Brunswick?

9        A.    I believe she's there now.

10        Q.    What did she do for a living?

11        A.    She was going to school whenever we were

12   together.

13        Q.    At Coastal?

14        A.    Yes.

15        Q.    And you were in Brunswick from what period

16   of time?  All of 2014 till December -- no.  I'm

17   sorry.  You just tell me.

18        A.    The spring of 2013 until December of 2014.

19        Q.    Okay.  Gotcha.  Now, are you currently a

20   lieutenant with the Department of Corrections at

21   Rogers State Prison?

22        A.    Yes, sir.

23        Q.    And you're currently working?

24        A.    No.  I'm currently on workman's comp.

25        Q.    When did that start?

18

1      A.    My injury occurred August 31st of last

2  year, and I was placed on FMLA.  And my workman's

3  comp benefits started this year on March 1st, I

4  believe it was.

5      Q.    Okay.  And so you're receiving weekly

6  workers' compensation benefits?

7      A.    That's correct.

8      Q.    What's the amount you're receiving?

9      A.    628.

10     Q.    Per week?

11     A.    Yes, sir.

12     Q.    And is that through the Department of

13 Administrative Services?

14     A.    Yes, sir.  It is.

15     Q.    Tell me what happened to cause the

16 workers' compensation injury.

17     A.    I was involved in an altercation with an

18 offender and sustained a left knee injury.

19     Q.    And that was at Rogers State Prison?

20     A.    That's correct.

21     Q.    Tell me what happened in the altercation.

22     A.    As far as like --

23     Q.    Just describe what happened.  How did you

24 become injured?

25     A.    I was doing a walk-through that night in

1  F3 dormitory.  There was an offender found in the day
2  room that was sleeping in the day room.  He was not
3  on his bunk bed as he was assigned.
4       Q.    Okay.
5       A.    I went by his bunk bed.  Another offender
6  was sleeping in his bunk and had sheets hanging over,
7  over the bed so where I couldn't see.  I took the
8  sheets down and he had possession of a cellphone, and
9  that's what caused the altercation was the cellphone.
10      Q.    Okay.  Was he not supposed to have the
11 cellphone?
12      A.    No.  Contraband is -- a cellphone is
13 considered contraband in the prison.
14      Q.    Okay.
15      A.    And he proceeded to assault me over the
16 cellphone.
17      Q.    All right.  Because you were going to take
18 the cellphone away?
19      A.    That's correct.
20      Q.    All right.  And so y'all had an actual
21 physical altercation?
22      A.    Yes, sir.
23      Q.    How did your knee become injured?
24      A.    I took him to the ground.  He was
25 considerably taller than I was.  And whenever I

1  jumped up to take him to the ground, we both landed

2  on my left knee.

3       Q.    I gotcha.  Okay.  And who are you treating

4  with for the knee injury?

5       A.    Chatham Orthopaedic in Savannah, Georgia.

6       Q.    What's your doctor that you're treating

7  with?

8       A.    Dr. Holtzclaw.

9       Q.    And did you have any torn ligaments or

10  anything?  What's the actual injury, if you know?

11       A.    As far as -- I know the MRI did not show

12  any tears or breaks in the bone.  I'm currently

13  waiting on a nerve conduction study on my left leg.

14       Q.    Okay.  Now, do you have an attorney for

15  your workers' compensation claim or is that just

16  being handled by the study?

17       A.    I have an attorney for that case as well.

18       Q.    Okay.  And who is your attorney for that

19  case?

20       A.    Mr. Josey with the McArthur Law Firm.

21       Q.    Okay.  Give me that again.  Mr. Josey

22  with?  What's the name of the firm?

23       A.    McArthur Law Firm.

24       Q.    Is that out of Macon?

25       A.    Yes, sir, it is.

1      Q.    Katherine McArthur?

2      A.    Yes, sir.

3      Q.    All right.  And do you know who is

4   defending that claim for the state?

5      A.    As far as I know, nobody's assigned to --

6   on the state's behalf.

7      Q.    All right.  But they are paying you weekly

8   compensation, and I assume they're paying the medical

9   bills from Chatham Orthopaedics?

10      A.    Yes.

11      Q.    All right.  But your attorney's handling

12   the, I guess, whatever correspondence there is with

13   the state?

14      A.    That's correct.

15      Q.    You said you started getting paid on March

16   1st for the workers' compensation injury; is that

17   right?

18      A.    That's correct.

19      Q.    Did they pay you back to the 8/31 date or

20   was the 8/31 through March 1st solely FMLA?

21      A.    It was solely FMLA.

22      Q.    Okay.

23      A.    And my leave time.

24      Q.    I'm sorry?

25      A.    And my leave time.

1    Q.    Leave time?  Okay.  When was the actual

2   last day you worked at Rogers?

3    A.    They -- they weren't honoring my profile,

4   which is why they wanted me to go on FMLA.  However,

5   there was another lieutenant that went on -- that had

6   annual leave for, I believe it was two weeks, or

7   maybe it was a week in the month of -- maybe it was

8   September.  And they had me fill in for him for those

9   couple days that he was assigned to work, and then

10   they placed me back on FMLA.

11    Q.    Okay.  So you went out on FMLA leave on

12   8/31, worked a couple of days for this other

13   individual, and then went back on FMLA; is that

14   right?

15    A.    No.  My FMLA did not start on August 31st.

16   It started -- it started in -- in September.

17    Q.    Okay.  I'm sorry.  Was the altercation on

18   8/31?

19    A.    Yes.

20    Q.    Okay.  Gotcha.  And so did you work at all

21   between, other than the couple of days, did you work

22   between then and the FMLA leave starting in

23   September?

24    A.    I worked for a couple of days after my

25   injury to see if I -- if the swelling would go down

23

1    and my mobility would improve.  However, after

2    realizing that my mobility wasn't improving and I

3    wasn't able to physically handle the job at that time

4    as a supervisor, that's when I elected to go on

5    medical leave.

6         Q.    Okay.

7         A.    So I did go to work for a couple of days

8    after my injury just to see if it was going to

9    improve or not, and it did not improve.  That's when

10   I got X-rays done at Tattnall, Tattnall Hospital.

11        Q.    All right.

12        A.    And started my process, the workman's comp

13   process.

14        Q.    Gotcha.  Have you had any surgery as a

15   result of that?

16        A.    No, sir.

17        Q.    Has any surgery been scheduled?

18        A.    No, sir.

19        Q.    All right.  Have you been told you need

20   any?

21        A.    No, sir.

22        Q.    How often are you treating with

23   Dr. Holtzclaw?  Is it as needed or regular

24   appointments?

25        A.    Hold on.  I want to correct -- I want to

1   correct something.  You stated in your last question

2   about if it was stated if I needed surgery?

3        Q.    Yes, sir.

4        A.    We're currently -- it's too early to tell

5   right now, but we're currently waiting on an IMG

6   nerve conduction study.  Dr. Holtzclaw did mention an

7   arthroscope.  However, it's too early to tell, like I

8   said, as far as the procedure, if it's needed or not,

9   until we get further testing.

10       Q.    So no surgery has been ordered or

11  recommended yet, but you're still undergoing testing?

12       A.    That's correct.

13       Q.    Now, is your treatment with Dr. Holtzclaw,

14  is that on a regular basis or as needed or --

15       A.    It's on a monthly.

16       Q.    Monthly?  Are you treating with anyone

17  else?

18       A.    No, sir.

19       Q.    Okay.  And I assume you're not working

20  anywhere doing any other kind of work at the present

21  time?

22       A.    No, I'm not.

23       Q.    What does a normal day for you consist of?

24       A.    As far as?

25       Q.    What are your activities?  Are you in

25

1    school or doing anything?  You're not working.  So

2    what do you do on a daily basis activity-wise?

3         A.    Activity-wise?  Nothing much.  I mean, if

4    I got to go to the grocery store, I go to the grocery

5    store.  Run errands.  That's about it.

6         Q.    Okay.  Other than that, you mainly stay at

7    home?

8         A.    That's correct.

9         Q.    Outside of the injury in the Army and the

10   injury with Rogers State Prison, have you ever had

11   any claims of any kind, lawsuits, any other workers'

12   compensation claims?

13        A.    I was hit by a drunk driver in 2014, I

14   believe it was.  Maybe it was '13.  And I received a

15   $5,000 settlement from that.  Other than that, no.

16        Q.    Where was that at?

17        A.    That was in Milledgeville, I believe it

18   was.

19        Q.    Okay.  Did you have an attorney or was

20   that just settled by the insurance company?

21        A.    I had an attorney in that case.

22        Q.    Do you remember who it was?

23        A.    Farah & Farah.

24        Q.    And were you living in Statesboro at that

25   time?

1        A.      No, sir.

2        Q.      All right.  Where were you?

3        A.      I was living in Brunswick.

4        Q.      Brunswick?  Okay.  So it was Farah & Farah

5    here in Brunswick?

6        A.      Yes.

7        Q.      Did you ever work here with the Glynn

8    County Police or Brunswick Police?

9        A.      No.

10       Q.      Just the Millennium Security that you told

11   me about while you were at Coastal?

12       A.      That's correct.

13       Q.      Okay.  One question I forgot to ask you.

14   How did you come to get to Ms. McArthur's firm in

15   Macon?  Did you know about them or . . .

16       A.      I was referred to them by Mr. Barton's

17   office.

18       Q.      Okay.  You told me you were promoted to

19   lieutenant on what day?  What time?

20       A.      I believe it was April 2020.

21       Q.      That would have been before this lawsuit

22   was filed?

23       A.      Yes.  It was during.

24       Q.      During the process but prior to the filing

25   of the complaint; correct?  You were getting ready to

1    file the lawsuit, is that what you're saying, but you

2    were promoted before the lawsuit was actually filed?

3         A.    I believe the lawsuit was filed before my

4    promotion.

5         Q.    Okay.  But your promotion was April of

6    2020?

7         A.    That's correct.

8         Q.    So if the lawsuit was filed on June of

9    2020, it would have been after your promotion;

10   correct?

11        A.    That's correct.

12        Q.    Okay.  Okay.  Mr. Copeland, I'm going to

13   ask you some questions about your gender

14   identification.  I'm not trying to embarrass you or

15   anything else.  This is part of my job and what we're

16   doing.  So don't take offense at anything that I ask

17   you.  Okay?

18        A.    Okay.

19        Q.    You were born as Cassandra or

20   Cassandra Copeland; is that correct?

21        A.    That's correct.

22        Q.    And you were born a biological female?

23        A.    That's correct.

24        Q.    All right.  And when did you -- I believe

25   the language in the complaint is that you identify as

28

1    a male; is that correct?

2         A.    That's correct.

3         Q.    When did you start identifying as a male,

4    if there's a time you can pinpoint?

5         A.    August 2018.

6         Q.    Okay.  All right.  And forgive me if I'm

7    ignorant of this whole process, but do you -- you

8    identify as a male.  Have you had the medical

9    procedure to fully transition to a male, if there is

10   such medical procedure?

11        A.    I've had medical procedures, yes.

12        Q.    All right.  So not only do you identify,

13   but you are transitioned fully to a male at this

14   point in time?

15        A.    I mean, depends on what your definition of

16   fully transitioned is.  Everybody's got a different

17   definition.  So I'm just wondering what the -- your

18   definition that you're referring to is.

19        Q.    Okay.  Do you still have female genitalia

20   are do you have male?

21        A.    I have female genitalia.

22        Q.    Okay.  But you identify as a male, and

23   that started August of 2018?

24        A.    That's correct.

25        Q.    All right.  I believe you underwent the

1    process of legally changing your name from Cassandra

2    to Tyler Copeland?

3           A.    Yes.  In 2018.

4           Q.    Would that have been August of 2018?

5           A.    That's correct.

6           Q.    Okay.  In looking back at your complaint,

7    which I thought I had seen it before, but it says in

8    2017, Lieutenant Copeland began his medical

9    transition; is that right?

10          A.    Say again.

11          Q.    In the complaint you allege in paragraph

12   11 that in 2017, you began your medical transition?

13          A.    That's correct.  I began my medical

14   transition a year before I changed my name.

15          Q.    Okay.  And what did that consist of?  I

16   mean, medications?  Hormones?

17          A.    Hormone replacement therapy.

18          Q.    Okay.  And so that was completed in August

19   2018, you legally changed your name to

20   Tyler Copeland?

21          A.    That is correct.

22          Q.    And then according to the complaint, in

23   September, you decided to disclose your gender

24   identity at work and with your coworkers?

25          A.    That is correct.

1    Q.    How did you go about that process?

2    A.    I went to the HR department and I gave

3  them my legal documents that I filed with the court

4  on my name change.  And that is how I disclosed that.

5    Q.    Okay.  Do you remember when you went to HR

6  specifically?  Would it have been September?  Do you

7  remember the exact date you went to HR?

8    A.    It was approximately two weeks after my

9  court date.

10    Q.    All right.  And do you remember when the

11  court date was?  Just trying to get a firm date as to

12  when you went to HR.

13    A.    I don't recall the exact date.

14    Q.    But it was sometime in September?

15    A.    The court date was in August.

16    Q.    All right.  And you believe you went to HR

17  in September.  You don't remember the date, though?

18    A.    That's correct.

19    Q.    And who did you actually talk with in HR?

20    A.    Becky Johnson.

21    Q.    Betsy Johnson?

22    A.    Becky.  I believe her first name is

23  Rebecca.

24    Q.    Okay.  And when you say "HR," is that the

25  HR there at the Rogers State Prison?

31

1      A.    That's correct.

2      Q.    All right.  And did you give her a copy of

3  the paperwork showing your name change?

4      A.    Yes, I did.

5      Q.    And what did she then do, if you know?

6      A.    Can you rephrase the question.

7      Q.    Yeah.  Did she change the name on all your

8  paperwork?  Did she have you sign anything?  Anything

9  like that?  Or you just handed over the paperwork and

10 that was it?

11     A.    I was told that in order to change my

12 information in post, I would have to have a birth

13 certificate that reflected my name change and gender

14 change according to the statutes in Georgia.  That's

15 all I recall from that conversation.

16     Q.    All right.  Did you go get those

17 documents?

18     A.    I did end up getting those documents, yes.

19     Q.    And did you give those to Ms. Johnson as

20 well?

21     A.    Yes, I did.

22     Q.    When did they -- when was your name

23 officially changed at -- I guess to Tyler Copeland?

24 Do you know?

25     A.    I was told to wait until we had a meeting

1    with Betsy Thomas on the matter.

2         Q.    Okay.  Did you tell employees at Rogers

3    State Prison that you were transitioning to a male?

4         A.    No, I did not.

5         Q.    All right.  When is the first time you

6    told anyone, if you did, at the prison, other than

7    Ms. Johnson, that you were now preferred to be

8    addressed as a male?

9         A.    I did not disclose that.

10        Q.    Okay.  All right.  At no time prior to the

11   meeting did you disclose any of the fact that you

12   were transitioning or you had changed your name from

13   Cassandra to Tyler?

14        A.    No, I did not.

15        Q.    All right.  When you started work with the

16   Department of Corrections, did you have an

17   orientation you went through?

18        A.    Yes.

19        Q.    What did that consist of?  Was it an

20   orientation to the job and to the policies of the

21   department and the prison?

22        A.    Yes.

23        Q.    All right.  And so I guess you were aware

24   that the department does not condone harassment,

25   sexual harassment or retaliation of any kind;

33

1   correct?

2       A.    That is correct.

3       Q.    And you were aware of the policy

4   prohibiting that by the Department of Corrections; is

5   that correct?

6       A.    Yes, that's correct.

7       Q.    When you started with the Department of

8   Corrections, did you have to undergo any training in

9   sexual harassment?

10      A.    Yes.

11      Q.    All right.  And tell me what that training

12  consisted of, if you remember.

13      A.    Can you repeat the question.

14      Q.    Sure.  What did the training consist of?

15  What did the harassment training consist of?

16      A.    Just the department's policy on zero

17  tolerance for sexual harassment and unlawful

18  harassment in the workplace, hostile environment, the

19  reporting system.  And there was a government -- a

20  governor's executive order that was issued --

21      Q.    Okay.

22      A.    -- on that.  That's all I recall --

23      Q.    All right.

24      A.    -- as far as that.

25      Q.    Were you provided a copy of the policy?

34

1        A.      Yes.

2        Q.      Who did you understand you reported

3    harassment or sexual harassment to?

4        A.      To the warden.

5        Q.      All right.  And have you worked, I don't

6    know if I clarified this, but have you worked at any

7    of the other prisons other than Rogers State Prison?

8        A.      While I was assigned to the interdiction

9    response team, I worked in pretty much every prison

10   in the state.

11       Q.      Okay.  And tell me what that position was.

12   What is the interdiction program you worked with?

13       A.      It's special operations.

14       Q.      Okay.  And so how many members does it

15   have?

16       A.      When I was on it, it was approximately 10

17   members on there.

18       Q.      All right.  And what did y'all do?  You

19   went from prison to prison doing what?  What was the

20   summary of the job, so to speak?

21       A.      We did -- we did mass shakedowns of the

22   facilities for contraband.  We investigated dirty

23   staff members.  Worked with intelligence and K-9

24   units to clean up the prison.

25       Q.      Gotcha.  Okay.  And once you started as a

1  correctional officer, you've been stationed at Rogers

2  State Prison for the entire time up until the present

3  outside of this time with the interdiction team?

4       A.    That's correct.

5       Q.    Okay.  Who were the wardens that you have

6  had at Rogers?

7       A.    Clay Tatum, Jeffrey Coleman,

8  Linton DeLoach and Brian Chambers.

9       Q.    Who was the second one?  After Mr. Tatum,

10 who was the next?

11      A.    Clay Tatum.  I'm not in any kind of order,

12 but . . .

13      Q.    I've got Clay Tatum, Linton DeLoach,

14 Brian Chambers.  And who was the fourth?

15      A.    Jeffrey Coleman.

16      Q.    Jeffrey Coleman.  Okay.  Thank you.  Did

17 you ever make any written complaints of sexual

18 harassment or intimidation or anything, retaliation

19 to either of those wardens?

20      A.    Can you -- can you repeat the question

21 again.

22      Q.    Did you ever make any written complaint of

23 harassment, retaliation, anything that would be

24 encompassed under Title VII to any of those wardens

25 during your time as an employee?

1          A.      Yes.

2          Q.      To who?  Name the ones you made it to and

3     how did you file a written complaint.

4          A.      Linton DeLoach and Brian Chambers.

5          Q.      Okay.  And what kind of complaint did you

6     make, written complaint did you make to DeLoach?

7          A.      That was on the -- I have to look at --

8     I'm not sure what the date is.

9          Q.      Are you referring to the Exhibit 2 that I

10    sent your attorney?

11         A.      Yes.

12         Q.      Okay.  And that starts out at the top of

13    the first page with September 10th, 2018, at 1600

14    hours?

15         A.      That's correct.

16         Q.      Okay.  And let me ask you a couple of

17    questions since you're looking at that, and then

18    we'll get back to my prior question.

19                 Was this document that's marked as

20    Exhibits 2, which we will provide to the court

21    reporter, does that contain all of your allegations

22    of harassment up through the date -- this was the

23    final entry, September 4th, 2019?

24         A.      Can you repeat the question.

25         Q.      Sure.  This document looks to be in a

1    summary, and I assume it was prepared by you; is that

2    correct?

3         A.    That's correct.

4         Q.    All right.  From the first entry of

5    September 4th -- September 10th, 2018, through the

6    final entry of September 4th, 2019, was the purpose

7    of this document to write down all of your

8    allegations of harassment or retaliation or what have

9    you that occurred between those two dates?

10        A.    This document is a compiled list of the

11   major incidents that took place.  However, it is not

12   a full summary of all harassment that took place at

13   Rogers State Prison.

14              As far as what is left out of this

15   document is the constant radio traffic that was used

16   in a harassing manner on a daily basis throughout the

17   shift.  Things like that that are kind of tedious I

18   did not include in this document.

19        Q.    All right.  Let me ask the question maybe

20   in a better way.  Was this intended to be used as

21   evidence to the EEOC of what you contended to be the

22   major retaliation, harassment, what have you, that

23   you were experiencing?

24        A.    In lesser words, I guess so, yes.

25        Q.    Okay.  Well, you mentioned the radio

1    traffic.  Explain what you meant by the radio traffic

2    that was -- I forget the term you used, but . . .

3         A.    Yes.  So, for example, we have call signs.

4    So as a supervisor at Rogers State Prison, my call

5    sign was a letter, a number and another letter.  So

6    for example, my call sign at one point was L1B.  So

7    whenever somebody refers to me on the radio as L1B,

8    they know that is Sergeant Copeland that they're

9    talking to or Lieutenant Copeland that they're

10   talking to.

11        Q.    All right.

12        A.    Now, whenever they follow that up with

13   "ma'am" and things like that over the radio,

14   throughout the radio traffic, that's what I'm

15   referring to is when people don't refer to me by my

16   call sign.  They refer to me as "ma'am" over the

17   radio.  So the whole institution can hear it.

18        Q.    Okay.  And these are radios that you carry

19   with you?

20        A.    Yes.

21        Q.    And all of the employees at the facility

22   have those radios?

23        A.    That's correct.

24        Q.    All right.  And you mentioned that they

25   would use your call sign and then say the word

39

1    "ma'am" afterwards?

2        A.    Yeah, after they were done reiterating

3    their message to me.

4        Q.    Okay.  How often did that occur?

5        A.    On a daily basis.

6        Q.    And this was between September 10th, 2018,

7    and the end of the document here of September 4th,

8    2019; is that correct?  That they would do this on a

9    daily basis?

10       A.    No.  That continued through my promotion

11   to lieutenant and did not stop throughout my

12   employment.  So I guess -- I guess it stopped

13   whenever I got injured on August 31st.  And then

14   after that, I followed up with FMLA.  That's when the

15   harassment stopped was when I was sitting at the

16   house.

17       Q.    Okay.  Who would do -- what individuals

18   would make these comments over the radio?

19       A.    Subordinates and other supervisors that

20   were assigned to my shift.

21       Q.    All right.  Okay.  Did you ever make a

22   written report of that to the warden in -- at Rogers

23   State Prison?

24       A.    I sent an e-mail whenever I was assaulted

25   by an employee.  That was the first, I guess,

1   written.  But my verbal complaints were ongoing

2   throughout this whole thing.

3       Q.   And did you make these verbal complaints

4   to the warden?

5       A.   No.  I made them to the HR department, to

6   my supervisors.  I tried to -- attempted to set up a

7   meeting with Linton DeLoach in particular and was

8   told that I couldn't meet with him because he was on

9   annual leave.

10      Q.   Okay.  All right.  And just to try to

11  narrow it down a little bit so we're not here all

12  afternoon, I just want to make sure that I've got

13  everything that you're complaining about or that this

14  lawsuit is based on.  And you've mentioned the radio

15  traffic, which you said was ongoing.

16      A.   Yes, that's correct.

17      Q.   Okay.  And when did that radio traffic

18  start?  Was it after this meeting on September, I

19  believe it was 28th, or did it begin before?

20      A.   It began after that meeting.  It -- it --

21  there was some comments made during the meeting and

22  then after the meeting it was, yeah, it was

23  continuing after the meeting.

24      Q.   All right.  So the radio traffic that

25  continued and then the allegations that are set out

41

1    in Exhibit 2, that document everything from September

2    10th, 2018, through September 4th of 2019?

3         A.    Yes.

4         Q.    I want to know if there's anything other

5    than that that you contend constituted hostile work

6    environment at Rogers State Prison from the time you

7    came out as a male until the confrontation with the

8    inmate that landed you at home?

9         A.    That's correct.

10        Q.    All right.  That's the totality of all of

11   the harassment that occurred as far as hostile work

12   environment?

13        A.    That I can recall at this time, yes.

14        Q.    Okay.  Now, did you document in Exhibit 2

15   all of your attempts to report this harassment to

16   your superiors?

17        A.    No, I did not.

18        Q.    All right.  Tell me about any times that

19   you -- any of the times that are contained in Exhibit

20   2 that you reported that are not documented in

21   Exhibit 2, if that makes sense?  In other words --

22        A.    I'm not understanding.

23        Q.    Okay.  Let's go to the third page, as an

24   example, of Exhibit 2.  The very first entry at the

25   top, June 18th, 2019.  Do you see that?

1    A.    Yes.

2    Q.    All right.  The first sentence says:  "I

3  spoke to HR assistant Tracy Gay reiterating my

4  concerns of harassment in the workplace.  I reported

5  harassment I was receiving from Officer Levitt and

6  Officer Kemp" -- if that's what it OFC refers to.

7  "They both misgendered me around new employees in

8  front of me and over the radio and smiled at me

9  after."

10          Do you see that?

11    A.    Yes.

12    Q.    Okay.  Well, that -- my point is that is

13  something that you had documented in Exhibit 2 as

14  where you reported the concerns you were having.

15          And so my question is:  Outside of these,

16  all of these incidents that are set out in Exhibit 2,

17  is there any other harassment that occurred during

18  this time period that you reported that you did not

19  document in Exhibit 2?

20    A.    Yes.

21    Q.    Okay.  Outside of the radio traffic, what

22  else was there?

23    A.    I don't have a specific date and time for,

24  you know, the other ones, but on numerous occasions,

25  I spoke to my direct supervisor and addressed

43

1    concerns that I had about the ongoing harassment,

2    sexual harassment that I was receiving.  I was -- I

3    spoke with medical staff at the facility about

4    conversations that they were hearing in the medical

5    unit between staff members.

6              I spoke with the food service director and

7    food service workers about conversations that were

8    taking place in the food service department.

9              I spoke with maintenance about

10   conversations that maintenance was having in the

11   maintenance department.

12             I spoke with the HR department and I spoke

13   with cadets, new -- new employees that were -- there

14   was one occasion where I gave a tour to a set of new

15   cadets that we were hiring.  And they were about to

16   go to the Academy, and they needed a tour of the

17   institution.  So I volunteered for that.  I gave the

18   tour to these individuals.

19             And in the HR department, one of the HR

20   workers referred to me as "ma'am" in front of these

21   cadets.  And they looked at me like they were

22   confused because they couldn't understand why she was

23   calling me "ma'am" in front of them.

24             Now, when I addressed myself as

25   Lieutenant Copeland, I took them on the tour, I

44

1    explained to them that you may hear people refer to

2    me as this.  That's not how you should refer to me

3    and this is why.

4         So there's been several incidents on about

5    me reporting and addressing verbally my concerns and,

6    I mean, all -- I mean, I'm not sure what you're

7    asking.

8         Q.   Well, my question was when have you -- did

9    you try to document every time you had reported

10   everything to a superior or the warden in this

11   document, Exhibit 2?  That was -- your task was to

12   sit down and record all of the conduct that you

13   thought was harassing or violative of your rights; is

14   that correct?

15        A.   Yes.  What I'm -- what I'm saying to you

16   is this is not a comprehensive list of all the

17   allegations and all the harassment that took place.

18   This is -- this is a breakdown.  And tedious things

19   like little conversations that I had sidebar

20   conversations are not included in this.

21        Q.   All right.

22        A.   Which took place on a daily basis.

23        Q.   Okay.  So the sidebar conversation would

24   be if someone referred to you as "ma'am"?

25        A.   Yeah.

1      Q.    All right.  And you contend that that

2  is -- I mean, you were offended by that?

3      A.    Yes.

4      Q.    All right.  Did you get along with most of

5  your employees there at Rogers State Prison?  Most of

6  your coemployees?

7      A.    Yes, I did.  I got along with the majority

8  of them.  However, there was -- there was a lot of

9  individuals that didn't agree with my lifestyle that

10  would cause problems for me.

11      Q.    Okay.  Name the ones that caused problems

12  that you said didn't agree with your lifestyle?

13      A.    Name them.

14      Q.    Yes.

15      A.    I don't have a comprehensive list of names

16  at this time.

17      Q.    Well, just tell me who you remember.

18  Specifically who do you remember that said things

19  that offended you or that you felt were violative of

20  your rights in these sidebars or what have you?

21      A.    I'd have to review a list of names.

22      Q.    I'm sorry?

23      A.    I'd have to review a list of names that

24  were submitted in this case to the names.

25      Q.    No, you can tell me.  I mean, you

1    remember -- you seem to remember hearing, for

2    example, the cadets and someone referred to you as

3    "ma'am."  Who was that?

4          A.    Are you talking about the cadets' names?

5          Q.    No.  You said that someone told the cadets

6    or in front of you referred to you as "ma'am" in

7    front of these cadets.  Who was that coemployee?

8          A.    That was Dian Small.

9          Q.    Okay.  So just give me any employees that

10   you remember that did these things from when you came

11   out until you left on the -- after the injury?

12         A.    That's not included in this?

13         Q.    From your memory.  I'm sorry?

14         A.    Like I said, my memory is -- my memory

15   is -- I'm not going to remember all the names because

16   --

17         Q.    Give me the ones you remember.

18         A.    Do you want me to look at this document

19   and just give you who else I remember?

20         Q.    If you're referring to a document, let me

21   know what you're referring to.

22         A.    Yeah.  Would you give me that list of

23   names that was or is that not allowed?

24         Q.    I don't want you to look at a list of

25   people that he has compiled and disclosed.  I want

47

1  you to tell me from your memory who has made these

2  comments that you contend were harassing or

3  constituted a hostile work environment that you can

4  remember.  I mean, you tell me that everything you

5  wrote down here two years ago wasn't comprehensive.

6  So I want to know who it was.

7       A.    Dian Small.  Officer McDowell.

8  Sergeant Brewton.

9       Q.    All right.  Are you going strictly from

10  memory here and not looking at a document?

11      A.    Yeah.  I'm going from memory.  And if I

12  leave anybody out, I mean, I'm not responsible for

13  anybody I leave out at this time.  I'm just going off

14  memory.

15      Q.    What do you mean you're not responsible?

16      A.    Because I'm trying to -- I'm trying to

17  recall three years of incidents that took place in

18  five minutes.  That's not possible.

19      Q.    Don't you agree with me that what you've

20  put down on Exhibit 2 in September of 2019 before you

21  filed your EEOC complaint would be more comprehensive

22  than what you're telling me now?

23      A.    Say again.

24      Q.    When you prepared this in September of

25  2019, your purpose was to show all of the harassing

48

1    conduct that had been occurring; is that correct?

2        A.    Up until the assault that took place.

3    Where this document ends is where I was assaulted at

4    work.  That is where my document stops because after

5    the assault that took place at my job where I was

6    interviewed by the investigator on the assault, and

7    the conclusion of the investigation was there was no

8    merit to my complaint.

9            So that is why I stopped documenting all

10   of this stuff was in September of 2019.  That is

11   correct.  Because I lost faith in the system.  I lost

12   faith in the internal affairs system because it

13   didn't work in my case.  Because there was no merit

14   to my case, that is why I stopped documenting.

15           And that is why I can't recall in this

16   interview right now all this -- the incidents that

17   took place because it's -- like I said, this list is

18   not comprehensive of all the instances that took

19   place.

20           Why is it not documented?  I explained why

21   it's not documented is because my faith in the

22   internal affairs system was lost at that time.

23   That's why it ends on September 2019.

24       Q.    When did the internal affairs

25   investigations start?

1      A.    I believe it was August 2019.  And it was

2 concluded in September 2019, to my knowledge.

3      Q.    Okay.  Who did you prepare this document

4 for, Exhibit 2?

5      A.    It was for myself.

6      Q.    For yourself?

7      A.    That's correct.

8      Q.    So that you would have a record of all of

9 the conduct that you contend was harassing?

10      A.    That's correct.

11      Q.    All right.  And so my point is that your

12 purpose of doing it there is more effective than

13 sitting here doing it from memory with me now;

14 correct?  So it's more likely that any conduct that

15 was harassing, you would have documented in Exhibit

16 2?

17      A.    As I said, it's not a comprehensive list

18 of all the incidents that took place at Rogers State

19 Prison.

20      Q.    At the time it was meant to be a

21 comprehensive list, wasn't it?

22      A.    It wasn't meant for anything at the time.

23      Q.    So you just spent however much time you

24 spent preparing a seven or eight page list for the

25 heck of it?

1      A.    I'm confused on the question.

2      Q.    Well, I think you're arguing with me about

3  something that doesn't really need to be argued

4  about.  When you sat down and prepared this list, the

5  purpose of preparing it was to document what you

6  contended to be harassment at your job; correct?

7      A.    Yes.

8      Q.    Okay.  And so when you sat down and did

9  it, you tried to put down everything you could

10  remember; correct?

11      A.    Yes.

12      Q.    Okay.  And you were much better at that

13  time to remember everything that occurred between

14  September 10th, 2018, and September 4th, 2019, than

15  you are here talking to me today; correct?

16      A.    That is correct.

17      Q.    All right.  So Exhibit 2 is a more

18  comprehensive list of what you actually -- of what

19  actually occurred between September of 2018 and

20  September 2019; correct?

21      A.    That is correct.

22      Q.    And that was the purpose of that?

23      A.    That is correct.

24      Q.    Okay.  And that's what I was trying to get

25  at.  All right.  And outside of the radio traffic

1    that you -- I can't remember the word you used, but

2    it's something like little things or where they would

3    call you "ma'am" -- is there anything else that

4    occurred between September 2018 and September 2019 of

5    a significant nature that you do not -- that you

6    recall now that is not included in Exhibit 2?

7         A.    Can you repeat the question.

8         Q.    Sure.  Is there anything other than -- we

9    talked about the radio traffic where somebody would

10   call your code and then your name and then use the

11   word "ma'am," which you said was offensive to you.

12         Outside of that and what you documented in

13   Exhibit 2, between September 2018 and September 2019,

14   is there anything else that you can recall that you

15   contend was harassing, retaliation, hostile work

16   environment, anything?

17         A.    Aside from the day-to-day radio

18   conversation, no.

19         Q.    Okay.  Thank you.  That's what I was

20   trying to get at.

21         Now, after the meeting with the

22   investigator, and I understand that -- who was the

23   investigator that actually investigated your

24   allegations of harassment?  Do you recall her name?

25         A.    Ms. Mosley.

52

1      Q.    Ms. Mosley.  Okay.  And she investigated

2   your complaints of harassment and made a

3   determination; correct?

4      A.    That's correct.

5      Q.    All right.  And then you made an

6   allegation that she was -- did something improper

7   during the investigation is the best way I'll

8   describe it; is that correct?

9      A.    That is correct.

10      Q.    And then they made an investigation of her

11   investigation; correct?

12      A.    That is correct.

13      Q.    All right.  And, again, they made a

14   determination of no cause for what you were alleging,

15   if that's a fair statement.  Do you agree?

16      A.    I do not agree.  That's not correct.

17      Q.    Okay.  Well, tell me what you think they

18   made a determination of.

19      A.    They concluded that the audio of --

20   footage that Investigator Mosley conducted my

21   interview with was compromised and they could no

22   longer access that to see if there was any

23   confirmation or not as far as her behavior.

24      Q.    Okay.  And what do you contend her

25   behavior was during the interviews with you?  What

1    was your complaint of Investigator Mosley that she

2    was -- was it that she was dismissive of your

3    complaints?

4         A.    She was dismissive and discriminatory in

5    her investigation.

6         Q.    How was she -- I'm sorry?

7         A.    She was dismissive and discriminatory in

8    her investigation.

9         Q.    All right.  How was she discriminatory in

10   her investigation?

11        A.    Because she referred to me as "ma'am" in

12   that initial interview as well on multiple occasions.

13        Q.    Okay.  All right.  Now, between September

14   2019 and the time you went out on workers'

15   compensation or after your injury, were there other

16   harassing incidents other than -- or did -- yes.  Let

17   me just leave it at that.  Were there other harassing

18   incidents?

19        A.    Can you repeat the question again.

20        Q.    Yeah.  Sure.  It was a bad question.  I

21   agree.

22              Between the investigation completion and

23   the time that you went out with your workplace

24   injury, were there other incidents that you

25   considered constituted hostile work environment,

1  harassment?

2      A.    Yes.

3      Q.    Okay.  What are those?  Is it continue

4  referencing you as "ma'am" on the radio?

5      A.    In person, on the radio, assigning me to a

6  certain post or to a certain shift.

7      Q.    All right.

8      A.    I was given a new shift assignment, I

9  believe, every couple months.  So . . .

10     Q.    Isn't that common in the Department of

11 Corrections?

12     A.    It's common, but not as common as I was

13 switched around.  There was -- I was switched around

14 excessively compared to other employees.

15     Q.    But you're required to be available to

16 work any shift at any time, aren't you?

17     A.    That's what they say, yeah.

18     Q.    Okay.  And that has been consistent since

19 you started with the department as Cassandra;

20 correct?

21     A.    What are you referring to the consistency

22 about?

23     Q.    Consistent that you're required to work

24 any shift at any time.  That's been the case since

25 you started with the Department of Corrections?

1      A.    That's correct.

2      Q.    All right.  And that applies to males?

3   Females?  Anybody else?  Correct?

4      A.    That's correct.

5      Q.    You mentioned -- there are two allegations

6   of physical contact that you make.  One is with

7   Officer Holland and Sergeant Bacon, I believe.

8      A.    Yes, sir.

9      Q.    Where Officer Holland pushed your right

10  shoulder, and Sergeant Bacon slapped you on your

11  right shoulder, and both of those are documented in

12  Exhibit 2; is that correct?

13     A.    That's correct.

14     Q.    All right.  Have there been any other

15  physical altercations or contact, physical contact

16  with coemployees or workers?

17     A.    Other than those two incidents, no.

18     Q.    Okay.  All right.  And both of those

19  matters were included in the investigation that

20  Mosley did; is that correct?

21     A.    I don't believe that she investigated

22  Officer -- Sergeant Bacon slapping my shoulder.

23     Q.    She investigated Holland but not Bacon,

24  you believe?

25     A.    That's correct.

1      Q.    Now, on page 1 of Exhibit 2 -- I think
2  that's where it's referred to -- you acknowledged
3  that Betsy Thomas came down after you came out as
4  female and had a meeting at the prison; is that
5  right?
6      A.    That's correct.
7      Q.    And she reiterated that discrimination
8  against transgender or on the basis of gender
9  identity was not allowed; is that correct?
10      A.    That is correct.
11      Q.    And that is a direct violation of the
12  Department of Corrections policy; is that correct?
13      A.    That is correct.
14      Q.    And all the coemployees are instructed
15  that that was, in fact, the policy; right?
16      A.    That's correct.
17      Q.    On the first page of Exhibit 2, if you'll
18  go down to the next-to-the-last paragraph and look at
19  that with me.
20      A.    Yes.
21      Q.    It says:  This was -- "that was the
22  beginning of the unlawful and sexual harassment I
23  began experiencing at work.  Since then a lot of
24  people have accepted me and have had good faith
25  effort addressing me accordingly.  However, there are

57

1    still a handful of individuals who constantly harass

2    me at work, undermine my authority as assistant shift

3    supervisor, and cause hostile abusive working

4    conditions."  Do you see that?

5         A.    Yes.

6         Q.    All right.  Who are those handful of

7    individuals that you're referring to in that

8    paragraph?

9         A.    Well, like I said, the list is not -- is

10   not -- I'm not able to make a list of individuals at

11   this point because, like I said previously, I was

12   switched from multiple shifts, and I was supervising

13   multiple employees, and I was assigned to every shift

14   at Rogers State Prison, night shift and day shift, A

15   key and B key.

16             So for me to recall individuals that

17   participated in this harassment over a two-year

18   period is -- is -- is impossible for me to recall the

19   names right now for you.  Because I was, like I said,

20   I was reassigned shifts considerably more times than

21   any other employee at Rogers State Prison, I was

22   switched shifts.

23        Q.    You mentioned Dian Small and

24   Officer McDowell, I believe, as two that you

25   remembered?

58

1        A.    Yes.

2        Q.    Do you remember any more?  Any other

3    names?

4        A.    Officer Nelson.  Lieutenant Dixon.

5        Q.    Okay.

6        A.    Officer Williams.  Officer Lockhart.

7        Q.    Okay.

8        A.    Officer Bacon.

9        Q.    Any others right now?  I'm sorry.  What

10   was the others?

11       A.    I cannot recall any other -- other

12   individuals at this time.  I mean . . .

13       Q.    Okay.  You -- after coming out as female

14   in August or September 2018, between that time period

15   and when you were promoted to lieutenant in 2020, can

16   you tell me the jobs that you applied for that you

17   contend you were not promoted to because of your --

18   because of gender discrimination?

19            MR. BARTON:  Todd, excuse me for jumping

20       in.  This is not an objection, but I just want

21       to make one correction.  You said that you were

22       referring to prior to coming out as female.  I

23       think you meant to say male, or coming out as

24       male.

25            MR. CARTER:  I'm sorry.  That's correct.

1    Q.    (By Mr. Carter)  Okay.  Mr. Copeland,

2  between the time you came out as male in September of

3  2018 and the time that you were promoted to colonel

4  in 2020, can you tell me the jobs you applied for but

5  were not given which you contend are discriminatory

6  on behalf of the department?

7    A.    Can you say the dates again.

8    Q.    Yeah.  Between the date you came out as

9  male in September, whenever it was, September, I

10  believe, of 2018, and the time that you were promoted

11  to lieutenant in 2020.

12    A.    The positions you said?

13    Q.    The positions you applied for, yes.  The

14  positions that you applied for that you contend you

15  were not given because of discrimination.  Were there

16  any?

17    A.    Yes.  There was multiple applications.  I

18  applied for lieutenant at Rogers State Prison.  I

19  believe I submitted four or five lieutenant

20  applications.

21         I submitted a transfer request to Treutlen

22  PDC as a sergeant.  I was denied.

23         I applied with the juvenile justice, I

24  believe it was for parole.  I was denied that

25  transfer.

1      I was -- I applied at the Federal Bureau

2  of Prisons in Estill, South Carolina.  I was denied

3  that position.

4      I also applied for a position with the

5  Georgia Southern University Police Department.  I was

6  denied that.

7      I applied for a investigator position with

8  the Georgia Department of Corrections.  Was denied.

9      I applied for -- I believe that was it.

10  That's the ones I applied for.

11      Q.    Now, the applications you made with the

12  Department of Juvenile Justice, let's take that one.

13  Was that part of the Department of Corrections?

14      A.    No.  I believe it falls under Department

15  of Community Supervision Juvenile.

16      Q.    All right.  And do you have any

17  information that somehow the Department of

18  Corrections prevented you from getting that job?

19      A.    Character references.  Other than that,

20  no, I do not.

21      Q.    Do you know of any character references

22  that were given or not given to the Department of

23  Juvenile Justice?

24      A.    I am not aware, no.

25      Q.    Okay.  The same with Treutlen, the

61

1   facility in Treutlen.  Is that part of the Department

2   of Corrections?

3        A.    Yes, it is.

4        Q.    Okay.  All right.  And what was the reason

5   you were given for not getting that job?

6        A.    Was not given a reason.

7        Q.    All right.  The Federal Bureau of Prisons,

8   that's not part of the Department of Corrections,

9   obviously?

10       A.    No.

11       Q.    All right.  And what job did you apply for

12  there?

13       A.    Correctional officer position.

14       Q.    And you were denied?  Did they give you a

15  reason?

16       A.    I was denied and not given a reason, no.

17       Q.    Do you have any indication that the

18  Department of Corrections influenced that decision in

19  any way?

20       A.    Yes.  I believe they did.

21       Q.    How?  How do you believe that?

22       A.    Through character reference whenever they

23  were contacted by that employer.

24       Q.    All right.  Do you know what character

25  reference they gave?

1      A.    I cannot -- I don't know any character

2   reference that they may or may not have given, no.

3      Q.    All right.  Did anyone at the Federal

4   Bureau of Prisons inform you that you were not hired

5   because of a character reference from the Department

6   of Corrections?

7      A.    I was not given a reason.

8      Q.    All right.  And that's the same with the

9   Department of Juvenile Justice?

10      A.    That's correct.

11      Q.    So that is simply speculation on your

12   part?

13      A.    Yeah.  I guess you could say that.

14      Q.    And the same with Georgia Southern

15   University?

16      A.    Say again.

17      Q.    The position you applied for with Georgia

18   Southern University, that's not part of the

19   Department of Corrections?

20      A.    No, it's not.

21      Q.    And so you don't know that the Department

22   of Corrections had any say or gave a character

23   reference of any kind to Georgia Southern, do you?

24      A.    I know that Lieutenant Stokes gave a

25   character reference in my application to Georgia

63

1    Southern.

2        Q.    Okay.  What was the character reference?

3        A.    I do not know that conversation.  I was

4    not present.

5        Q.    All right.  How do you know he gave a

6    reference?

7        A.    Because he told me that they contacted

8    him.

9        Q.    Okay.  But you don't know whether it was

10   good or bad?

11       A.    I do not.

12       Q.    And you don't know the reason why you were

13   not hired at Georgia Southern?

14       A.    No.  I was not given a reason.

15       Q.    Okay.  And the investigator position, you

16   said that was with the Department of Corrections?

17       A.    That is correct.

18       Q.    Were you given a reason why you were not

19   hired for that?

20       A.    No, I was not.

21       Q.    All right.  With regard to all of these

22   positions that you applied for, do you know who the

23   final decisionmaker was as far as the hiring

24   decision?

25       A.    Are you referring to within the department

1   or outside the department?

2         Q.    Well, obviously -- let's just take it this

3   way:  You don't have any idea who made the decisions

4   of the positions outside of the department, do you?

5         A.    No.

6         Q.    Okay.  Inside the department, do you know

7   who ultimately made the decision for each of the

8   positions?

9         A.    No, I do not.

10         Q.    All right.  And you don't know if they had

11   any information about your allegations of harassment

12   or complaints, do you?

13         A.    I'm sure they did.  But can I confirm that

14   they did?  No.

15         Q.    Okay.  You just don't know.  Is that fair?

16         A.    I guess you can say I don't know with a

17   certain amount of certainty.  I can just speculate.

18         Q.    All right.  So it's speculation?

19         A.    That's correct.

20         Q.    Okay.  How are these positions -- and I'm

21   talking specifically about ones for lieutenant now,

22   because you were promoted to lieutenant in 2020; is

23   that correct?

24         A.    That is correct.

25         Q.    How are these positions advertised within

1   the department?

2       A.    Can you repeat that question.

3       Q.    Sure.  How are the positions advertised

4   within the department?  Is there a Web site where

5   their postings are made?

6       A.    Yes, there is.

7       Q.    Is there any other, I guess, communication

8   about the positions?

9       A.    There's an internal communication.

10       Q.    All right.  So you may get an e-mail or

11  notification that a position is open for a certain

12  position at a certain prison, and then you decide

13  whether you want to apply or not?

14       A.    I don't receive those e-mails.  Internal

15  communication, I mean verbal within the department.

16       Q.    Okay.  All right.  And how many times did

17  you apply for lieutenant before you were promoted?

18       A.    I believe it was four or five times.

19       Q.    All right.  And no reason was given for

20  not promoting you for those four or five times?

21       A.    No.

22       Q.    And do you know who made the decisions in

23  those occasions?

24       A.    No, I do not.

25       Q.    And you don't know whether those people

1    that made the decisions had any knowledge of your

2    complaints of harassment or discrimination?

3         A.    They had knowledge of my harassment and

4    discrimination complaints.

5         Q.    How do you know that if you don't know who

6    made the decision?

7         A.    Say again.

8         Q.    How can you know that they had knowledge

9    when you just told me that you don't know who made

10   the decision?  Again, it's speculation; correct?

11        A.    What I'm referring to is whenever I

12   applied for a position at, say, applied for

13   lieutenant at Rogers State Prison, Rogers State

14   Prison had knowledge of my allegations.

15        Q.    But you don't know who in the department

16   made the final decision on that particular hiring;

17   correct?

18        A.    I wasn't interviewed for every application

19   I submitted.

20        Q.    All right.  How many interviews did you

21   conduct for lieutenant at Rogers State Prison?

22        A.    I believe it was three.

23        Q.    All right.  And do you remember who

24   interviewed you for each position?

25        A.    No, I do not.  It's different every time.

67

1      Q.    Okay.  All right.  So you can't tell me

2   whether they knew or did not know of your

3   allegations?

4      A.    No.

5      Q.    Okay.  Now, you essentially have three

6   claims in this complaint.  You contend that you were

7   subjected to a hostile work environment; is that

8   correct?

9      A.    That's correct.

10     Q.    And we've discussed that here today.  Is

11  there anything you want to add to what we've

12  discussed concerning those allegations?

13     A.    Can you repeat the question.

14     Q.    Sure.  We've discussed what you contend

15  was hostile work environment at Rogers State Prison.

16  We've got your Exhibit 2, which you -- which goes

17  from September the 28th of -- September 2018 through

18  September 2019.  You've told me about the other

19  incidents.

20          Is there anything else that you want to

21  add that you contend constituted hostile work

22  environment or sexual harassment at Rogers State

23  Prison up until the time you went out on workers'

24  comp?

25     A.    No, not at this time.  I don't want to add

68

1   to anything.

2        Q.    I'm sorry?

3        A.    I don't want to add to anything at this

4   time.

5        Q.    Okay.  And the failure to promote claims,

6   you've got failure to promote because of your

7   allegations and your gender, have we talked about all

8   of the failure to promote positions that you contend

9   are at issue in this case?

10       A.    Yes.

11       Q.    Okay.  And with regard to retaliation, you

12  contend that you were retaliated against for making

13  these claims of harassment and you were denied

14  promotions because of that.  Have we talked about

15  everything in that claim that you contend constituted

16  retaliation?

17       A.    No.  I just wanted to address that I

18  attempted to get out of the hostile working

19  conditions by transferring outside of the department

20  and obtaining another job, and I was unable to do so

21  successfully.  Applying for jobs that I'm

22  overqualified for, and I was told I was overqualified

23  for.

24            And the reason that I was not given any of

25  those positions leads me to question why I wasn't

69

1   given those positions when I was overqualified and I

2   was competent enough to obtain those positions.

3        Q.    Now, were those positions within the

4   department or were those the other positions we

5   talked about?

6        A.    I'm referring to the other positions that

7   I applied for outside of the Department of

8   Corrections.

9        Q.    Okay.  And you contend that that was

10  somehow retaliation by the Department of Corrections?

11       A.    Yes.

12       Q.    But you don't know the Department of

13  Corrections had anything to do with those hiring

14  decisions; correct?

15       A.    I just know that I was getting harassed

16  where I was at, and I was attempting to leave and I

17  was unable to leave.

18       Q.    All right.  But, again, just to be clear,

19  you don't have any knowledge that the Department of

20  Corrections had any input into those decisions from

21  those outside entities not to hire you; correct?

22       A.    The only one I can verify was when I

23  applied for the University of Georgia Southern Police

24  Department, Lieutenant Stokes did offer a character

25  reference on my behalf, and that was stated to me.

1    What was said, I'm not sure.

2        Q.    Okay.  All right.  And you've never seen

3    the reference if it was written or know what was said

4    if it was verbal?

5        A.    That's correct.

6        Q.    Let me, if you will, look at Exhibit 1

7    that I handed, the sexual harassment prevention

8    policy.  Do you recognize that as the policy that

9    would have been affective, it looks like March of

10   2019?

11       A.    Yes.

12       Q.    All right.  And do these change

13   periodically, to your knowledge, or are they updated?

14       A.    Yes.  They're updated.

15       Q.    All right.  But you're aware of the policy

16   and aware when they are updated?

17       A.    Not all the time, no.

18       Q.    All right.  How does it come to you?  Do

19   you have to go through training on certain things on

20   a yearly basis and you may get a new policy, or is it

21   given to you, an employment review or what?

22       A.    I don't get any notifications.  Whenever

23   we do our annual in-service on the matter, we would

24   get updates at that time.  Other than that, we don't

25   usually get updates unless we're reading it.

71

1      Q.    All right.  Do you do an annual update on

2    the sexual harassment policies?

3      A.    Yes.

4      Q.    And all of their policies are posted on

5    their Web site, aren't they?

6      A.    Yes.

7      Q.    Okay.  Now, Mr. Copeland, there are no

8    out-of-pocket expenses that you've incurred in this

9    case, are there?

10     A.    Could you repeat the question.

11     Q.    With regard to damages, you haven't had to

12   expend any money as a result of this case, have you?

13   Are you out of pocket any money?

14           MR. BARTON:  I'm going to object to that,

15       but you can answer, Tyler.

16     A.    The out-of-pocket expenses in this case --

17     Q.    (By Mr. Carter)  Yes.

18     A.    -- you're referring to?

19     Q.    Yes.

20     A.    Are very minimal.

21     Q.    What are they?  I mean, you continued to

22   work at the salary you had at the time; correct?

23     A.    That's correct.

24     Q.    And you continued to work up until the

25   time you were injured.  And the injury had obviously

72

1    nothing to do with these allegations.  And so that's

2    being handled through workers' compensation.

3              So you don't have any loss of income;

4    correct?

5         A.    That's correct.

6         Q.    And you don't have any specific medical

7    expenses that you attribute to this matter or

8    incident or this conduct; correct?

9         A.    I did incorporate the -- the biweekly fee

10   for the -- the mediator for my situation with the

11   department.

12        Q.    Okay.  Explain that to me.  I'm not sure

13   what you're referring to.

14        A.    The employee assistance program.

15        Q.    All right.  And is that like a -- explain

16   what that is.

17        A.    The employee assistance program helped

18   mediate some of the meetings in this case, and I was

19   seeing this individual on a biweekly basis for

20   counseling.

21        Q.    Okay.  It's a counselor that you see, and

22   that service is provided through the department?

23        A.    The employee assistance program, that's

24   correct.

25        Q.    But there's a biweekly fee to you?

1      A.     Yes.

2      Q.     How much is that?

3      A.     $65.

4      Q.     How long did you go through this program

5  and incur that fee?

6      A.     I'm not sure of the start date.

7          MR. CARTER:  All right.  Because, Ken,

8      y'all didn't give me any calculation of damages.

9      Q.     (By Mr. Carter)  Outside of that fee, is

10  there anything else, any other out-of-pocket cost?

11     A.     No, there's not.

12     Q.     Okay.  And, obviously, you're not paying

13  your attorney.  That's based on a fee that's not --

14  that doesn't require you to pay him on an hourly

15  basis; correct?

16          MR. BARTON:  I'm going to object to this

17      as well, but Tyler, I think you can answer that.

18          THE COURT REPORTER:  I'm sorry,

19      Mr. Barton, I couldn't hear the last part.  You

20      said but.

21          MR. BARTON:  I'm going to object to the

22      extent that it's attorney/client privilege, but

23      I was telling Mr. Copeland to go ahead and

24      answer.

25          THE WITNESS:  I'm sorry.  Could you repeat

74

1       the question one more time.

2               MR. BARTON:  Sure.  Sure.

3       Q.    (By Mr. Carter)  And I'm not asking you to

4   disclose conversations between you and your attorney.

5   But you have not had to write any checks to

6   Mr. Barton for fees, have you?

7       A.    Yes, I have.

8       Q.    How much?

9       A.    I'm not sure how many -- I mean, I was on

10  a monthly payment basis.

11              MR. CARTER:  Okay.  Well, I certainly

12          think that's relevant, Ken, and you didn't

13          provide that to me.  Will you supplement?

14              MR. BARTON:  This is like synchronized

15          swimming when it comes to muting and whatnot.

16          Could we go off the record for just a half

17          second?

18              MR. CARTER:  Sure.

19              (Recess from 2:43 p.m. to 2:44 p.m.)

20      Q.    (By Mr. Carter)  All right.  Mr. Copeland,

21  there are categories of cases in a lawsuit:  Fees,

22  which is paying the attorney for his work, and then

23  expenses such as filing fee, copying costs, things

24  like that.

25              You haven't written Mr. -- or Mr. Barton's

1   firm a check for any fees for their work, have you?

2        A.   Can you repeat the -- can you repeat the

3   definition again and the question.

4        Q.   Yes.  Fees are what an attorney charges

5   you for his work.  And I assume that Mr. Barton's

6   firm is on a contingent fee basis for their work; is

7   that correct?

8        A.   That is correct.  They're on a contingent

9   fee basis.

10        Q.   Okay.  And there may be expenses that you

11   pay for as the case goes along such as filing fees or

12   things like that.  Have you written a check for any

13   of those type expenses to Mr. Barton's firm?

14        A.   Yes.  I was on a monthly payment plan for

15   those fees.

16        Q.   And do you know the amount of those?

17        A.   Not collective, no.

18        Q.   Okay.  How much are you paying monthly?

19        A.   I was paying a hundred dollars a month

20   through, I believe it was this spring whenever our

21   deposition -- or disclosure disputes began.

22        Q.   Okay.  And so how many months did you pay

23   the hundred dollars per month?

24        A.   I cannot recall when the fees began.

25        Q.   Okay.

76

1          MR. CARTER:  If you can just supplement

2     that, Ken, in your responses at some point.

3          Q.   (By Mr. Carter)  And outside of the

4     employee assistance program, you haven't had any

5     medical expense or expense for any kind of treatment,

6     have you?

7          A.   No, sir.

8          Q.   All right.  So you don't have any expenses

9     for that; correct?

10          A.   That's correct.

11          MR. CARTER:  All right.  Let's go off the

12     record for a few minutes and let me check and

13     see if I have anything else, if that's

14     agreeable.

15          MR. BARTON:  Okay.

16          (Recess from 2:47 p.m. to 3:02 p.m.)

17          MR. CARTER:  I don't have anything

18     further, Ken.

19          MR. BARTON:  I've got a couple questions.

20     Like I said, this is like doing synchronized

21     swimming, so please bear with us.  I'll ask

22     Mr. Copeland to mute when I'm asking a question.

23                      EXAMINATION

24     BY MR. BARTON:

25          Q.   Thanks for your time today.  Just a couple

1    quick followup from what --

2              THE COURT REPORTER:  Mr. Barton, I don't

3        know why, but you were going in and out.

4              MR. BARTON:  Can you hear me now?

5              THE COURT REPORTER:  Yes, sir.

6              MR. BARTON:  Okay.  I don't know if it's

7        the WiFi or my wireless ear buds.  Sorry about

8        that.  Let me know if that happens again.

9              THE COURT REPORTER:  Yes, sir.

10   Q.    (By Mr. Barton)  Lieutenant Copeland, you

11   were talking about disclosing --

12             THE COURT REPORTER:  I'm sorry.  It's

13        breaking up again.

14             (Discussion off the record.)

15   Q.    (By Mr. Barton) Lieutenant Copeland,

16   you're referring to coming out as trans to your

17   coworkers in September of 2018.  Can you tell us

18   again when exactly did you come out to your

19   coworkers?

20             MR. CARTER:  I can't hear him at all.

21             THE COURT REPORTER:  Was your question did

22        you come out to your coworkers?  Because the

23        last word didn't come through.

24             (Discussion off the record.)

25   Q.    (By Mr. Barton)  You were talking about

1    time when you came out to your coworkers.  Can you

2    tell us again when that was?

3         A.    That was at the meeting with Betsy Thomas

4    at the end of September 2018.

5         Q.    Had you come out to any of your coworkers

6    prior to that meeting?

7         A.    No, I did not.  Just the HR department.

8         Q.    Why did you not come out to any of your

9    coworkers prior to the meeting with Betsy Thomas?

10        A.    I was advised by the HR department that it

11   would probably be best for me to wait until

12   Betsy Thomas could address the staff members in

13   meetings prior to coming out on my own.

14        Q.    Lieutenant Copeland, there was a lot of

15   discussion about --

16             THE COURT REPORTER:  I'm sorry.  You are

17        breaking up again.

18             MR. BARTON:  Am I still breaking up or is

19        this working out now?

20             THE COURT REPORTER:  You're starting to

21        break up again, yes, sir.  I'm only getting a

22        few words.

23             MR. BARTON:  I'm sorry.  Can you hear me

24        now?  Am I still breaking up?

25             THE COURT REPORTER:  Yes.  Why don't you

1          try it slow.  I find sometimes if you go slow,

2          it works.  But . . .

3                    MR. BARTON:  Gotcha.

4          Q.    (By Mr. Barton)  Lieutenant Copeland,

5     there was quite a bit of discussion about Exhibit 2.

6     Do you recall that document?

7          A.    Yes, I do.

8          Q.    Was this a document that you prepared in

9     order to submit to the Equal Employment Opportunity

10    Commission?

11         A.    No, it was not.

12         Q.    What was the purpose of that document?

13         A.    The purpose of the document was to

14    document main, clearcut examples of discrimination in

15    my case.

16         Q.    Was this something you prepared as these

17    events were ongoing or something else?

18         A.    They were prepared -- some of them were

19    prepared as the events unfolded in the year -- within

20    the 2019.  The first page on the exhibit was actually

21    constructed from memory and from a reserva --

22    resignation letter that I had typed up in preparation

23    to resign due to the harassment.  But I did not -- I

24    ended up not resigning and I just -- I just -- that's

25    how I constructed that first page.

1      Q.    Understood.  Thank you.  And I think you

2  said that Exhibit 2 included all of the hostile work

3  environment allegations that you can recall.  Do I

4  have that correct?

5      A.    Can you repeat the question one more time.

6      Q.    I believe you said at some point, when you

7  were speaking to Mr. Carter, that the items listed in

8  Exhibit 2 were all incidents of hostile work

9  environment allegations that you could recall.  Do I

10  have that information correct?

11      A.    It would -- that's what was stated.

12  However, this is not a cumulative documentation on

13  all the incidents that took place.

14      Q.    So if there's an incident that you

15  referred to in your EEOC charge that's not listed in

16  Exhibit 2, would that -- would that event from

17  your -- from Exhibit 2 be -- I'm sorry.  Let me

18  rephrase that.

19          If there's an incident or event listed in

20  your EEOC charge that does not appear in your Exhibit

21  2, does that mean that the incident discussed in the

22  EEOC charge isn't accurate?

23      A.    No, it does not because the documentation

24  ends on September 2019 after I was assaulted at my

25  place of work.  After that investigation was

1 concluded, I stopped documenting on Exhibit 2.

2 Q. Let me ask that question a different way.

3 If you discussed an event in your EEOC charge, are

4 you saying that that description of events is

5 accurate?

6 A. Yes, I am.

7 Q. And if you describe an incident or event

8 in your complaint that was filed in Federal Court,

9 are all those incidents accurate?

10 A. Yes, they are.

11 Q. You raised several issues in written

12 discovery. And by written discovery, I'm

13 specifically referring to the response to the

14 interrogatories. If you discussed an incident or

15 event in your response to the interrogatories in this

16 case, are all of those events accurate?

17 A. Yes, they are.

18 Q. Can y'all still hear me?

19 A. Yes.

20 Q. Now I'm having issues with my ear buds.

21 I'm almost done. I promise. I apologize for all of

22 these technical issues.

23 Mr. Copeland, you were going through a

24 list of people who were involved in harassment when

25 you were talking to Mr. Carter. And you referred to

1  a document that you would like to refer to or refresh

2  your recollection about additional names.

3       A.    That's correct.

4       Q.    Do you know what document that was?

5       A.    Yes.  That was the document attached with

6  the initial disclosures.

7       Q.    Those were the initial disclosures that

8  were submitted in this case?

9       A.    Yes.

10      Q.    Lieutenant Copeland, did you help prepare

11  that document?

12      A.    Say again.

13      Q.    Did you help prepare the initial

14  disclosures that were submitted in this case?

15      A.    Yes.

16      Q.    And so if you look at pages 1 to 2 of the

17  initial disclosures, you identify individuals who

18  were responsible for harassment; is that correct?

19      A.    Yes, that is correct.

20      Q.    So the names of the people on that list,

21  are those people involved in the harassment of you?

22      A.    Yes.

23      Q.    Thank you.  You were talking about being

24  reassigned to different shifts while working at

25  Rogers State Prison.  Do you recall that?

1          A.     Yes, I do.

2          Q.     And Mr. Carter asked you about a policy

3     regarding being available to work applying to anyone

4     regardless of their gender.  Do you remember that

5     question?

6          A.     Yes, I do.

7          Q.     Let me ask you a slightly different

8     question, Lieutenant Copeland.  Are you aware of any

9     coworkers who do not identify as transgender who are

10    reassigned shifts as much as you are?

11         A.     I do not.

12         Q.     Thank you.  Going back to that meeting

13    with Betsy Thomas, the HR director, I think you said

14    earlier that she said that harassment based on gender

15    identity is a violation of GDC policy.  Do I have

16    that right?

17         A.     That is correct.

18         Q.     From your perspective, do you believe that

19    the supervisors who were present in that meeting took

20    this information that Ms. Thomas communicated

21    seriously?

22         A.     Not all of them, no.

23         Q.     For the people who were in that meeting

24    who were coworkers, subordinates or on an equal level

25    as you, do you believe that they took what Ms. Thomas

84

1    said about harassment being a violation of GDC policy

2    seriously?

3            A.    No, I don't.

4            MR. CARTER:  Let me enter an objection to

5        the form of the question.  Calls for

6        speculation.

7            Q.    (By Mr. Barton)  You can answer, Tyler?

8            A.    No, I do not believe they did.

9            Q.    Why do you say that your coworkers and

10   supervisors did not take Ms. Thomas's word seriously?

11           A.    Because there was a -- specifically there

12   was a female that had made some comments during the

13   initial meeting, and those comments were not

14   addressed by Ms. Thomas.

15           Q.    When you say that a female coworker made

16   comments, was this during the meeting itself with

17   Ms. Thomas?

18           A.    That is correct.  It was in front of the

19   whole shift that I was assigned over as a supervisor.

20   And I felt like it did not help my situation as far

21   as my authority as a supervisor kind of overrode my

22   authority as a supervisor.

23           Q.    So after the meeting ended, do you believe

24   those same coworkers and supervisors took

25   Ms. Thomas's word seriously?

85

1        A.      No, I did not.

2                MR. CARTER:  Objection.  Speculation.  Go

3        ahead.

4        A.      No, I do not.

5        Q.      (By Mr. Barton)  And why do you say that?

6        A.      Say again.

7        Q.      Why do you say that your coworkers and

8    supervisors did not take this warning seriously after

9    the meeting?

10       A.      Because in the meeting, the initial

11   meeting when that specific female made those

12   comments, they were not -- they were not addressed

13   during or after the meeting.

14       Q.      Was there anything else that happened

15   after the meeting with Ms. Thomas that made you

16   believe that these coworkers and supervisors did not

17   take the warning seriously?

18       A.      Can you repeat that one more time.

19       Q.      Did any incidents occur after the meeting

20   with Ms. Thomas that made you feel that coworkers and

21   supervisors did not take Ms. Thomas's warning

22   seriously?

23       A.      Yes.  There was -- that was when the

24   initial sidebars started and the radio traffic

25   harassment began.

1    Q.    Understood.  And when you were speaking to

2    Mr. Carter, you discussed several other jobs that you

3    applied for within the Georgia Department of

4    Corrections.  Do you recall that conversation?

5    A.    That is correct.  I do.

6    Q.    Of these jobs that you applied for with

7    the Georgia Department of Corrections, did they have

8    similar compensation to what you're making now or

9    were they more or less?

10   A.    They were more.  And one was a lateral

11   transfer to -- transfer to a different institution

12   other than Rogers.

13   Q.    Which one was the lateral transfer?

14   A.    That was the sergeant position at Treutlen

15   PDC.

16   Q.    And when you say "lateral," does that mean

17   similar compensation to what you're making now or

18   what does that mean?

19   A.    Yes.  That means the same compensation.

20   Q.    And the other jobs that you said were not

21   a lateral transfer, which ones were those?

22   A.    The investigator position with the Georgia

23   Department of Corrections and the several lieutenant

24   positions that I applied for with the Georgia

25   Department of Corrections.

1      Q.    Got it.  And is it your understanding that

2  the compensation for an investigator or for

3  lieutenant would have been more than what you were

4  making at the time that you applied?

5      A.    Yes.

6      Q.    Got it.

7           MR. BARTON:  That's all I have.  Thank

8      you.

9                    EXAMINATION

10 BY MR. CARTER:

11     Q.    All right.  Mr. Copeland, how much did the

12 lieutenant increase your salary?  How much does

13 promotion to lieutenant increase your salary over

14 what you were making?

15     A.    It was a 10 percent increase.

16     Q.    Okay.  And what were you making as at your

17 prior -- you were a sergeant before that; is that

18 correct?

19     A.    That is correct.

20     Q.    What is your pay as a sergeant?

21     A.    I believe it was 38,000.

22     Q.    38?

23     A.    Annually.

24     Q.    Go ahead.  Annually?

25     A.    38,000 annually.

1     Q.    And that was the salary up until the time

2 you were promoted to lieutenant?

3     A.    That is correct.

4     Q.    And what does the lieutenant's salary pay?

5     A.    I believe it was 42,000 annually.

6     Q.    All right.  Okay.  And you don't know the

7 time you made these four or five applications for

8 lieutenant; is that correct?  The specific time?

9     A.    No.  It should have been in my personnel

10 file.

11     Q.    Okay.  But regardless, it would be

12 sometime between September 28th, the meeting, and

13 when you were actually promoted to lieutenant in

14 2020; correct?

15     A.    Yes, sir.

16     Q.    All right.  So the difference in salary

17 would be whatever the difference was between the time

18 of the application and the time you received the

19 promotion in 2020; correct?

20     A.    That's correct.

21     Q.    What was the pay for the Department of

22 Juvenile Justice?  Do you know that?

23     A.    I do not recall that, no.

24     Q.    All right.  Do you have the initial

25 disclosures there in front of you?

89

1    A.    Yes, sir, I do.

2    Q.    Let's flip to the names of the people who

3  participated in harassment of plaintiff.  That's the

4  first question.  Do you see that?

5    A.    Yes, sir.

6    Q.    All right.  Kimberly Mosley, she was the

7  investigator; correct?

8    A.    She was a DR investigator.

9    Q.    All right.  And your contention is that

10  she discriminated during her investigation of your

11  complaints; is that correct?

12    A.    No, that's not correct.  Kimberly Mosley

13  is the DR investigator assigned to Rogers State

14  Prison.

15    Q.    Okay.

16    A.    Investigator Mosley's first name is not

17  Kimberly.

18    Q.    Gotcha.  Tell me how Kimberly Mosley

19  discriminated or harassed you.

20    A.    Say again.

21    Q.    How did Kimberly Mosley, who you have

22  identified, harassed or discriminated against you?

23    A.    She referred to me as "ma'am" on a couple

24  of occasions and laughed about it.

25    Q.    All right.  What about Jasmin Nelson?

1      A.     She had phone conversations with main
2   control operator, Officer Williams, and referred to
3   me as "it" and "that."  And she would constantly call
4   me "ma'am" throughout the duration of my shift while
5   I was supervising her.
6      Q.     Were you privy to that conversation
7   between Ms. Nelson and the other individual?  Did you
8   hear that conversation?
9      A.     No.  I was standing next to the main
10  control operator while that conversation was taking
11  place.  And as soon as the conversation ended, that's
12  when the main control officer, Sheena Williams, had
13  told me what was said.
14     Q.     All right.  But you did not hear
15  Ms. Nelson say that; correct?
16     A.     No, I did not.
17     Q.     What about Phillis Scott?  How did she
18  discriminate or harass you?
19     A.     She repeatedly called me "ma'am"
20  throughout the duration of my shift and laughed about
21  it.
22     Q.     Okay.  Was she a subordinate?
23     A.     Yes, sir.  Most of these are subordinates.
24     Q.     All right.  So you had supervisory -- you
25  were their supervisor?

1          A.     That is correct.

2          Q.     Did you ever discipline any of them for

3     that?

4          A.     No, I did not.  I spoke with the -- as I

5     was assistant shift supervisor, I would address it

6     with the assigned shift supervisor.  And that's --

7     that's how I would approach it.

8                 And I occasionally went to HR after my

9     supervisor failed to take any disciplinary action to

10    these individuals.

11         Q.     Did you have the same shift supervisor

12    over that time period?

13         A.     No, I did not.  I had several supervisors

14    assigned over me.

15         Q.     So you would report all of these incidents

16    to whichever shift supervisor you had at that

17    particular time?

18         A.     Yes, I did.

19         Q.     Give me the name of all the shift

20    supervisors that you had during this time period.

21    And I'm talking about after September of 2018.

22         A.     Lieutenant Andre Sharpe.

23         Q.     Okay.

24         A.     Lieutenant Jerry Lyles.  Lieutenant James

25    Bradford.  Lieutenant Mary Miller.  Lieutenant Marvin

92

1    Dixon.  Lieutenant Timothy Davis.  And I believe that

2    is it.  I might be missing one or two, but I do not

3    recall their names at this time.

4         Q.    All right.  Flip to the next page.

5    Shantell Smith, how did she harass or discriminate

6    against you?

7         A.    She would call me "ma'am" throughout the

8    duration of my shift and while I did post checks.

9         Q.    And Nurse Taylor?

10        A.    After the meeting with Betsy Thomas, she

11   stated to me that she was not going to call me "sir,"

12   and that wasn't who I was, and that didn't line with

13   her beliefs.  And she would repeatedly call me

14   "ma'am" throughout the duration of my shift while I

15   was escorting her to and from the pill call room.

16        Q.    Okay.  Veronica Williams?

17        A.    Veronica Williams, she would call me

18   "ma'am" throughout the duration of my shift.

19        Q.    Breanna Bacon?

20        A.    Breanna Bacon was assigned a split shift,

21   but in passing would call me "ma'am" on occasion and

22   smile about it.

23        Q.    Do you contend that Ms. Bacon assigned you

24   to different shifts because of harassment?  Did I

25   hear you correct that she did shift assignments?

1     A.    No, sir.  She was assigned to split

2  shifts.  So she was not assigned under me, per se,

3  but she was on five day a week.

4     Q.    Okay.  What about Karla Bacon?

5     A.    That was the sergeant that I worked with

6  that slapped me on my right shoulder after the

7  incident took place with Ms. Holland.

8     Q.    Marvin Dickson?

9     A.    He would actively discriminate me --

10  discriminate against me by refusing to allow me to go

11  to my transgender doctor appointment that was

12  prescheduled before my shift change to day shift.

13  And I was written up for going to my doctor's

14  appointment for my gender-conforming hormonal

15  replacement therapy.

16     Q.    Okay.  Kathy Culberson?

17     A.    Also Marvin Dickson would call me "baby

18  girl" and "ma'am" throughout the duration of my

19  shift.

20     Q.    All right.

21     A.    Kathy Culberson.  Kathy Culberson was also

22  a nurse that participated in harassment, called me

23  "ma'am" throughout the duration of my shift and was

24  also addressed at the meeting with Warden Chambers

25  and Betsy Thomas last year.

1       Q.      Broderick Brewton?

2       A.      He would call me "ma'am" on the radio

3    throughout the duration of my shift.  And I believe

4    he was also supposed to be present at that meeting

5    with Betsy Thomas and Warden Chambers, but he was not

6    present.

7       Q.      Jaquse Akins?

8       A.      Ms. Akins made comments about transgenders

9    and their genitalia around other offenders while she

10   was running conducting chow or feedoff of offenders.

11   So while offenders were eating and they would come

12   through the line, she was having conversations with

13   offenders about transgender individuals and their

14   genitalia and would laugh with the inmates about said

15   conversation.

16           She would also refer to me as "ma'am" on

17   occasion through passing.

18       Q.      McDowell.  I won't try to pronounce the

19   first name.

20       A.      Officer McDowell would call me "ma'am"

21   throughout the duration of my shift and refuse

22   instructions from me on a couple of occasions.  That

23   was reported to Lieutenant Jerry Lyles who addressed

24   her not following instructions from a supervisor.

25       Q.      Okay.  Dian Small, you talked about her.

1    But anything else in addition to what you told me

2    about her previously?

3         A.    No.  Just that she had referred to me as

4    "ma'am" in front of a group of brand new cadets,

5    brand new employees, and asked me if I would tour

6    them around the facility.

7         Q.    Sheila Holland?

8         A.    Sheila Holland assaulted me at work and

9    followed me outside in the perimeter vehicle and

10   parked behind my vehicle.  Made some gestures to me

11   and things like that.

12        Q.    And that was what the Investigator Mosley

13   investigated one of the incidents that she

14   investigated; correct?

15        A.    That is correct.  And she also impeded my

16   entering the facility one day.

17        Q.    Okay.  Stephanie love?

18        A.    She, after -- after addressing my shift

19   with Andre Sharpe, Lieutenant Andre Sharpe allowed me

20   to address my shift one morning.  Stephanie Love

21   approached me later that morning and stated to me

22   that it was a violation of -- it was a violation

23   of -- I can't remember how she worded it, but it was

24   against people's religion, and I need to watch how I

25   talk to other individuals about how -- if they have a

1  certain religious belief, that I needed to respect

2  that.

3       Q.    Do you agree with that?

4       A.    What's the question?

5       Q.    Do you agree with that, that you need to

6  respect other people's religious beliefs?

7       A.    Yes, I do.

8       Q.    Okay.  Terrilisa Barnes?

9       A.    Terrilisa Barnes would call me "ma'am"

10 throughout the duration of my shift and also fail to

11 follow instructions from me on occasion.

12      Q.    And, again, you never wrote up any of

13 these subordinates.  You would give that to the shift

14 supervisor at the time and let them decide what to

15 do?

16      A.    That is correct.  I felt like it was a

17 conflict of interest.

18      Q.    Kenyatta Brown?

19      A.    Kenyatta Brown would call me "ma'am" on

20 occasion and was also present during the meeting with

21 Betsy Thomas.

22      Q.    Yolanda Byrd?

23      A.    Yolanda Byrd, she was -- she was the

24 deputy warden and would assign me to different

25 shifts.  After the investigation was concluded with

1    the incident with Ms. Holland that she was aware of,

2    she put me back on that shift, and I felt like I was

3    being put back in a hostile working condition.

4         Q.    Because you were put back on the shift

5    with Ms. Holland?

6         A.    That is correct.  Considering the

7    animosity and physical nature of the incident, I

8    don't feel like I should have been put back on that

9    shift.

10        Q.    You would agree, though, as you said

11   during the initial part of your deposition, that it's

12   just the nature of the job that you're going to be

13   given a lot of different shifts as a correctional

14   officer; correct?  You're required to work any shift

15   any time?

16        A.    I'm not required to work in a hostile

17   working condition and be assaulted at work.

18        Q.    That's not my question.  My question is:

19   You're required to work any shift any time; correct?

20   That's part of the job?

21        A.    That is correct.  But I'm not -- I don't

22   have to be assaulted while I'm at work.

23        Q.    Again, that's nonresponsive.  But you

24   agree with my statement you're required to work any

25   shift any time?

1        A.    Yes, I am.

2        Q.    Delores Fryer?

3        A.    She would call me "ma'am."  She was also a

4   coworker.  We were at the same rank, but she would

5   call me "ma'am" on occasion throughout the duration

6   of my shift.

7        Q.    Christopher Gay?

8        A.    He was the captain and had made some

9   comments in main control as far as referred to me as

10  a female in front of Lieutenant Jerry Lyles and, I

11  believe it was Kimberly Mosley and Tonya Reed were

12  present, if I can remember correctly.

13       Q.    Okay.

14       A.    And also -- yeah, that's all I got for

15  him.

16       Q.    Jaleesa Henderson?

17       A.    She would call me "ma'am" throughout the

18  duration of my shift in passing.

19       Q.    Erica Jefferson?

20       A.    She would call me "ma'am" on occasion when

21  we passed by each other.

22       Q.    Robin Kemp?

23       A.    She would also call me "ma'am" on occasion

24  throughout the duration of my shift.

25       Q.    Adrian Kirkland?

1        A.    She would call me "ma'am" on occasion

2  throughout the duration of my shift.

3        Q.    Zelda Lockhart?

4        A.    She would repeatedly call me "ma'am" every

5  time we came in contact with each other throughout

6  the duration of my shift.

7        Q.    How often was that?

8        A.    When I would do post checks or if I was

9  assigned to her building with her, it would be

10  constant.

11        Q.    Okay.  Alexandria Lovett?

12        A.    She called me "ma'am" on occasion in

13  passing.  In the -- she was assigned the kitchen.

14  She was a food service staff worker.

15        Q.    Okay.  Alton Mobley?

16        A.    He was the unit manager and would assign

17  me certain areas and ridicule the way that I would

18  operate or how I would basically run my post.

19        Q.    All right.

20        A.    He would my micromanage me.

21        Q.    Okay.  Tyeema Walters?

22        A.    She would call me "ma'am" on occasion

23  throughout the duration of my shift.

24        Q.    Johneshae Mincey?

25        A.    She had called me "ma'am" on occasion and

1   she was also -- she would also dictate where I would

2   put my officers.  If I -- she was the seg sergeant,

3   segregation sergeant.  So whenever I would assign

4   officers to work that post, she would have an issue

5   with how I -- who I would assign in her area if it

6   wasn't her friends that she worked with.  Before I

7   was assigned to that shift, she would cause problems

8   between myself and the deputy warden and things like

9   that and dictate how I ran my shift basically.

10          Q.     Henry Wimberly?

11          A.     He was the captain during -- during my,

12   you know, after my -- after the meeting with

13   Betsy Thomas, he became the captain.  And he was

14   aware of the harassment that was taking place and was

15   also present during the locator card incident that

16   took place in the captain's office.

17          Q.     Okay.  Syreeta Lovett?

18          A.     She would call me "ma'am" throughout the

19   duration of my shift.

20          Q.     Timothy Goodell?

21          A.     He would call me "ma'am" through passing

22   and make jokes about transgender individuals and

23   their genitalia.

24          Q.     And Terry Stokes?

25          A.     Would call me "ma'am" and make

1    transgender -- well, and make transgender jokes with

2    Timothy Goodell about transgender individuals and

3    their genitalia.

4         Q.    If you would, Mr. Copeland, explain to me

5    how the, I guess, the shifts work at Rogers State

6    Prison.  Would you be around all of these people

7    every time you worked?

8         A.    No, sir.  I would not.

9         Q.    How many people would work on a shift in

10   the area you were working, if you understand the

11   question?  In other words, when you were on duty or

12   on the job, would you be going throughout the prison

13   or are you limited to a particular place in the

14   prison or how does it work?

15             I'm just not familiar with the prison

16   setup, so I just want you to explain.  For example,

17   when you go in for your shift, how many people do you

18   normally interact with on a particular workday at the

19   prison?

20        A.    At that time it was about 10.

21        Q.    Okay.  So about 10 coemployees that you

22   would interact with on an everyday basis on your job?

23        A.    No.  I was assigned to a specific post.

24   Usually I was assigned in an area.

25        Q.    Okay.  So how many people would you

1  actually see then on a daily basis?

2       A.    Between three and five.

3       Q.    All right.  And so between three and five

4  of these people that you would see, all the people

5  that you've identified would do the things that you

6  said they did, was that on a daily basis or, as you

7  said, occasionally?  You wouldn't see every person;

8  correct?

9       A.    Now, when I'm referring to these

10  individuals that I'm not in direct contact with, I do

11  have access to a radio to get in touch with them.

12  And they have a radio to get in touch with me.

13          So even though we're not physically in

14  direct contact, they can still call me on the phone

15  or refer to me on the radio and communicate that way.

16       Q.    Okay.  So how many of these individuals

17  would you say did this on a daily basis?

18       A.    I'd say about three or four.

19       Q.    All right.  And they would make these

20  "ma'am" comments or the other things you described on

21  a daily basis these same three or four or would it be

22  three or four different, depending on who was there?

23       A.    It was three or four different ones

24  depending on who was there and what shift I was

25  assigned to at the time.

1     Q.    All right.  And of the subordinates, you

2   never wrote any of them up for that; is that correct?

3     A.    That is correct.

4     Q.    Now, Exhibit 2, that your attorney came

5   back and asked you some questions about, did you

6   submit this to your attorney?  I'm not asking what

7   you talked about.  That your last entry is September

8   4th, 2019, and your charge letter written by your

9   attorney is dated September 30th, 2019.

10          You gave Exhibit 2 to your attorney to be

11   used for the EEOC charge; correct?

12          MR. BARTON:  I'm going to object to the

13      extent that it's attorney/client privilege and

14      work product.

15          MR. CARTER:  I don't think it's

16      attorney/client privilege because all I'm asking

17      is did he provide it to you.

18          MR. BARTON:  Tyler, you can answer the

19      question.

20     A.    I do not recall if it was before or after

21   the 30th date.

22     Q.    (By Mr. Carter)  Well, your attorney

23   prepared a letter to the EEOC which you signed as

24   your charge on September 30th; is that correct?

25     A.    That sounds correct, yes.

1    Q.    All right.  And the information,

2  obviously, in the charge would have had to have come

3  from you?

4    A.    That is correct.

5    Q.    Did anybody direct you to write Exhibit 2?

6    A.    No, sir.

7    Q.    All right.  And what was the purpose of

8  you doing Exhibit 2?

9    A.    It was to create a -- the purpose of it

10  was to create a timeline of events for myself, for

11  personal recollection of the events.

12         MR. CARTER:  All right.  That's all I've

13     got.

14         MR. BARTON:  Nothing else from me.

15         (Deposition concluded at 3:45 p.m.)

16         (Pursuant to Rule 30(e) of the Federal

17  Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),

18  signature of the witness has been waived.)

19

20

21

22

23

24

25

105

CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA:

COUNTY OF CHATHAM:

I hereby certify that the foregoing transcript was reported as stated in the caption and the questions and answers thereto were reduced to writing by me; that the foregoing 104 pages represent a true, correct, and complete transcript of the evidence given on Monday, August 23, 2021, by the witness, TYLER COPELAND, who was first duly sworn by me.

I certify that I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c); I am a Georgia Certified Court Reporter here as an employee of Gilbert & Jones, Inc. who was contacted by Todd Carter, Esquire, to provide court reporting services for the proceedings; I will not be taking these proceedings under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and by the attached disclosure form I confirm that neither I nor Gilbert & Jones, Inc. are a party to a contract prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board.

This 30th day of August, 2021.

_____
Annette Pacheco, CCR-B-2153

GILBERT & JONES

106

1                      DISCLOSURE OF NO CONTRACT

2              I, Debbie Gilbert, do hereby disclose
     pursuant to Article 10.B of the Rules and Regulations
3    of the Board of Court Reporting of the Judicial
     Council of Georgia that Gilbert & Jones, Inc. was
4    contacted by Todd Carter, Esquire, to provide court
     reporting services for these proceedings and there is
5    no contract that is prohibited by O.C.G.A.
     15-14-37(a) and (b) or Article 7.C. of the Rules and
6    Regulations of the Board for the taking of these
     proceedings.

7
              There is no contract to provide reporting
8    services between Gilbert & Jones, Inc. or any person
     with whom Gilbert & Jones, Inc. has a principal and
9    agency relationship nor any attorney at law in this
     action, party to this action, party having a
10   financial interest in this action, or agent for an
     attorney at law in this action, party to this action,
11   or party having a financial interest in this action.
     Any and all financial arrangements beyond our usual
12   and customary rates have been disclosed and offered
     to all parties.

13
              This 30th day of August, 2021.
14

16   _____
     Debbie Gilbert, FIRM
17   REPRESENTATIVE
     Gilbert & Jones, Inc.
18

19

20

21

22

23

24

25

**POLICY**  **MEMORANDUM** 

| SUBJECT: Statewide Sexual Harassment Prevention Policy | EFFECTIVE: March 1, 2019 |
|---|---|
| ISSUED BY: DEPARTMENT OF ADMINISTRATIVE SERVICES OFFICE OF THE STATE INSPECTOR GENERAL | |

## I.  Introduction

While there are multiple types of workplace harassment, as Executive Order 01.14.19.02 recognizes, incidents of sexual harassment present unique challenges which warrant special emphasis and the implementation of a particularized approach to the prevention, detection and elimination of sexual harassment from the State workplace.

## II.  Purpose

The State of Georgia promotes respect and dignity and does not tolerate sexual harassment in the workplace. The State is committed to providing a workplace and environment free from sexual harassment for its employees and for all persons who interact with state government. All State of Georgia employees are expected and required to interact with all persons including other employees, contractors, and customers in a professional manner that contributes to a respectful work environment free from sexual harassment.

This Policy is intended to set standards for Executive Branch agencies and employees in furtherance of this commitment and to protect individuals from sexual harassment and retaliation.

## III.  Authority

Executive Order 01.14.19.02 directs the Georgia Department of Administrative Services Human Resources Administration Division (HRA), in consultation with the Executive Counsel to the Governor, to promulgate a uniform sexual harassment prevention policy that shall apply to all Executive Branch agencies.

In addition, pursuant to O.C.G.A § 45-20-4, the Georgia Department of Administrative Services is responsible for ensuring compliance with all applicable federal and state statutes and regulations concerning personnel administration and related matters. This includes, but is not limited to, the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, U.S. Const. amend. XIV., the Equal Protection Clause of the Georgia Constitution, Ga. Const. Art. 1, Sec. I, Para. II., Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., and the Fair

Page 1 of 7

Employment Practices Act of 1978, O.C.G.A §§ 45-19-20, et seq., which prohibit employment discrimination and harassment on the basis of sex.

### IV.    Applicability

The provisions of this Policy apply to all Executive Branch agencies. This Policy does not apply to the Board of Regents of the University System of Georgia, the Legislative Branch, or the Judicial Branch.

### V.    Definitions

For purposes of this Policy, the following definitions apply:

(a) "Agency" or "Agencies" means any Executive Branch agency, authority, board, bureau, commission, council, department, office, unit, entity, or instrumentality of any kind, and others as may be designated by the Governor, or to the extent that such designation does not conflict with state law.

(b) "Employee" is a person who is hired to provide services to the State on a regular basis in exchange for compensation and who does not provide these services as part of an independent business. "Covered Employee" is a person who is hired to provide services to an Agency on a regular basis in exchange for compensation and who does not provide these services as part of an independent business.

(c) "Investigator" is a person designated by his or her Agency head to conduct investigations related to sexual harassment complaints or reports.

(d) "Retaliation" is an act or omission intended to, or having the reasonably foreseeable effect of, punishing or otherwise negatively impacting an individual for submitting (or assisting with submitting) a complaint of or reporting sexual harassment, for participating in a sexual harassment investigation or proceeding, or for otherwise opposing sexual harassment.

(e) "Sexual harassment" is physical, verbal, or non-verbal/visual conduct that is either (i) directed toward an individual or (ii) reasonably offensive to an individual because of his or her sex. Therefore, for purpose of this Policy, "Sexual harassment" includes physical, verbal, or non-verbal/visual conduct constituting:

1. Unwanted sexual attention, sexual advances, requests for sexual favors, sexually explicit comments, and other conduct of an expressed or obviously implied sexual nature, by an individual who knows, or reasonably should know, that such conduct is unwanted and offensive; and

Page 2 of 7

2. Conduct that is hostile, threatening, derogatory, demeaning, or abusive or intended to insult, embarrass, belittle, or humiliate an individual *because of his or her sex* – regardless of whether the underlying reason for the conduct is apparent.

This Policy purposefully prohibits all sexual harassment and is not limited to conduct that would rise to the level of unlawful conduct under state or federal anti-harassment laws.

(f) "Supervisor" or "Manager" is a Covered Employee who has the authority to oversee, hire, fire, demote, or to effectively recommend hiring, firing, or demotion, or to make or effectively recommend other material changes to the working conditions of at least one employee.

## VI.     Prohibited Conduct

(a) All Covered Employees are strictly prohibited from engaging in sexual harassment as defined herein. This prohibition applies to conduct occurring in or otherwise affecting the workplace. As such, it includes conduct occurring both on and off the work premises and during or outside of work hours. While sexual harassment encompasses a wide range of conduct, some examples of conduct specifically prohibited by this Policy include, but are not limited to:

1. Denying (directly or indirectly) an employment benefit or employment-related opportunity to an employee for refusing to comply with a sexually-oriented request;
2. Threatening (directly or indirectly) to deny an employment benefit or an employment-related opportunity to an employee for refusing to comply with a sexually-oriented request;
3. Providing or promising (directly or indirectly) to provide an employment benefit or employment-related opportunity to an employee in exchange for complying with a sexually-oriented request;
4. Engaging in sexually-explicit or suggestive physical contact, including touching another employee in a way that is unwelcome or restricting an employee's movement;
5. Displaying or transmitting pornographic or sexually-oriented materials (such as photographs, posters, cartoons, drawings, or other images) or storing or accessing such materials on State-owned equipment for personal use or consumption;
6. Engaging in indecent exposure;
7. Making obscene gestures (i.e., hand or bodily gestures);
8. Making romantic advances and persisting despite rejection of the advances;
9. Using sexually-oriented language or making sexually-related propositions, jokes, or remarks, including graphic verbal commentary about an individual's body or clothing; and,

Page 3 of 7

10. Sending sexually suggestive or obscene messages by mail, in person, by telephone, or by electronic communication.

(b) Agencies and Covered Employees are further prohibited from engaging in retaliation against an employee for submitting (or assisting with submitting) a complaint of or reporting sexual harassment, for participating in a sexual harassment investigation or proceeding, or for otherwise opposing sexual harassment.

(c) A Covered Employee found to have engaged in sexual harassment and/or retaliation in violation of this Policy will be subject to corrective and/or disciplinary action, up to and including termination of employment.

(d) A third party found to have engaged in sexual harassment and/or retaliation may be subject to appropriate corrective action. Such action may include, but is not limited to, termination of contract, removal from Agency premises, restricted access to Agency premises and/or personnel, or notification to the third party's employer.

(e) Agencies shall immediately refer any reported criminal conduct the appropriate law enforcement agency. Such referral shall not prohibit an Agency from pursing its own investigation of the complaint or report. If criminal activity is suspected the Agency shall confer with the Office of the State Inspector General (OIG) regarding how to proceed with the Agency investigation.

## VII. Training

(a) Agencies shall require all Covered Employees, including part-time, temporary, seasonal employees, and independent contractors who are regularly on Agency premises and/or regularly interact with Agency personnel to complete employee sexual harassment prevention training on an annual basis. An independent contractor may waive state-mandated training upon acknowledgement of this Policy and documentation that he/she has completed sexual harassment prevention training offered by his/her employer within the last year.

(b) Agencies shall provide sexual harassment prevention training to all new or transferred Covered Employees within thirty (30) calendar days of hire.

(c) Agencies shall require sexual harassment prevention training for supervisors and managers on an annual basis. New supervisors and managers must complete this training within thirty (30) calendar days of employment or promotion to a supervisory or managerial position.

(d) Agencies shall utilize the standardized training provided by HRA to fulfill the obligations under this Policy for employee and manager training.

PL0203

(a) Each Agency shall designate at least two of its employees, not of the same gender, to conduct investigations under this Policy. Agencies must ensure that employees directly supervised by designated investigators have the ability to submit complaints or reports of sexual harassment to an individual other than their direct supervisor or manager.

(b) Agencies shall report to the OIG the names and contact information for the designated investigators and a HR contact via the OIG's online portal within seven (7) business days of the effective date of this Policy. Should a vacancy in an investigator or HR contact role occur, a replacement shall be designated and reported to the OIG within seven (7) business days of the vacancy via the OIG online portal.

(c) Agencies shall cooperate with any determination by the OIG that a complaint or report cannot be handled internally at the Agency from which it originated. Agencies shall cooperate fully with the impartial investigator assigned by the OIG to handle the complaint or report.

(d) The assigned investigator shall complete the investigation and issue a report of findings as promptly as possible but at least within forty-five (45) calendar days of assignment. An Agency Head may consider an extension of time due to extenuating circumstances.

## X.    Resolution

(a) Agencies shall make a final determination, and if necessary, implement appropriate corrective or disciplinary action and remedial measures depending upon the nature of the policy violation, as soon as possible but in no event more than twenty-one (21) calendar days of receipt of the investigative report.

(b) Agencies shall consult with and provide updates to the OIG as requested and promptly produce any information related to a sexual harassment or retaliation complaint or report or the investigation upon the OIG's request.

(c) Agencies shall, to the extent consistent with thorough investigation and with procedures outlined in this Policy, maintain confidentiality of information reported to the Agency. Complaints and reports of sexual harassment or retaliation, investigative reports, final determinations, and other related documents will be subject to disclosure under the Open Records Act upon completion of the investigation.

## XI.    Acknowledgement and Recordkeeping

(a) Agencies shall make this Policy available to all Covered Employees and retain documentation of each Covered Employee's acknowledgment of receipt of the Policy in his or her personnel file.

Page 6 of 7

(b) All complaints and reports, investigative documents, policy acknowledgements, and records of training attendance shall be retained pursuant to the statewide record retention schedule and as otherwise required by law pursuant to specific requests for preservation.

**Effective Date**

This Policy becomes effective March 1, 2019 and may be revised as necessary.

Revision History

| Version | Date |
|---------|------|
| 1.0 | March 1, 2019 |

PL0205



**September 10ᵗʰ, 2018 @1600 Hrs.**

I conducted a phone interview with the HR Director Betsy Thomas after disclosing to my HR manager Becky Johnson that I legally changed my name and notified her of my transgender status. I was told it was standard procedure to hold a meeting with the HR Director regarding any transitioning employees. During the phone interview I over heard third party individuals laughing in the background when Mrs. Thomas asked me if I had "the surgery" or if I was going to get it in the future. I stated, "that's nobody's business." I was under the impression this conversation was not confidential and I was now a laughing matter in the Department headquarters.

A week or two later we conducted a meeting in person. In the meeting one of the issues that were addressed was the "bathroom" issue. It was implied to me that they didn't want me to use the male restroom and I didn't feel comfortable using the female marked restroom. The resolution was for me to use a none marked bathroom. However, there is only 2 bathrooms that are gender specific in the whole institution and they are mainly for visitation or administrative staff. I stated "I'm not going to make a non-issue an issue. None of the bathrooms are gender specific. They are all co-ed."

All shifts/ staff at Rogers State Prison were addressed by Mrs. Thomas Deputy Warden McFarlane and Warden Deloach in briefing. Everyone was given a directive to address me with male pronouns and/or Sgt Copeland if anyone had personal issues surrounding my transgender status. I was ensured that the GDC supported my decision and that I would not be over looked for promotions or discriminated against because of my transition. I was also ensured that from that day forward I would exclusively be addressed with male pronouns or by rank and last name. If I had any issues with other employees I was to report it to my supervisor and the HR Department.

I was present when my shift was addressed on this issue. When asked if anyone had questions, officer Barnes started referring to my genitalia and stated, "If Sgt Copeland hasn't had "the surgery" yet how can Sgt Copeland strip search (male) offenders." and later on she mentioned that if the Department was going to allow me to strip search offenders then they might as well let females do it too. Mrs. Thomas and DW McFarlane explained they would have to get clarification from the legal department on the issue.

That was the beginning of the Unlawful and sexual harassment I began experiencing at work. Since then a lot of people have accepted me and have had good faith effort addressing me accordingly. However, there are still a handful of individuals who constantly harass me at work, undermine my authority as an assistant shift supervisor and cause hostile/ abusive working conditions. Officers are disclosing my transgender status to new employees and offenders through gossip and radio traffic when they refer to me as "mam" and "She." Individuals have also made explicit comments surrounding my genitalia and referred to me as "It" and "That." This issue prevents me from being an effective supervisor and leader within the department.

I have addressed these instances one on one or attempted to ignore the constant harassment as I have not received proper support from my coworkers or supervisors to address the issues at hand. When I have brought up or attempted to bring up situations I'm facing they are often overlooked and ignored with no follow up.

### February 2nd, 2019 @0445 Hrs.

I was assigned a new supervisor (Lt Sharp) and on Feb 2nd he gave me an opportunity to address my shift after I explained to him about the constant harassment that I was dealing with. I reiterated that there is a zero tolerance to unlawful harassment in the workplace. I gave the officers another directive on how to address me and stated "if anyone has personal or religious issues surrounding the use of male pronouns Sgt Copeland will be fine. We work in an environment with a rank structure and last name basis."

### February 12th, 2019 @ approximately 1130

I was approached in front of B Building by Lt Love and told that I was wrong for addressing my shift on the issues I was facing, and a grievance could be filed against me for interfering with individuals' religious beliefs. She also stated, "you need to watch how you talk to your officers." I Reported this to another supervisor. Later that afternoon one of my subordinates (OFC S. Smith) that has consistently addressed me with male pronouns in the past began referring to me as "she/her" when referring to me around new employees, that may possibly be my subordinates in the future. I addressed this issue about OFC Smith to my supervisors Lt Thomas and Lt Hartmeyer with no resolution. They stated to me that I need to be patient and give people "more time to adjust" when we had a meeting with OFC Smith. The meeting ended with OFC Smith raising her voice and walking out of the office.

### February 21st, 2019

I spoke with HR Manager Becky Johnson regarding my upcoming FMLA paperwork and explained that I did not agree with the way the situation with OFC Smith was handled. She attempted to coordinate a meeting with the Warden. However, I was told that he was going to be out of town on leave and wouldn't be able to meet with him before I went on FMLA on Feb 25th. No meeting occurred.

### February 25th, 2019 – May 29th, 2019

FMLA Taken. Upon returning to work on May 29th nobody followed up with me regarding the issues I reported prior to going on Medical Leave.

### June 6th, 2019

I contacted the Employee Assistance Program to get some assistance with issues in the workplace through the Alternative Dispute Resolution which include therapists and mediators. I explained my situation and never heard back from them.

### June 17th or 18th, 2019 – before feeding off

Lt Davis (recruitment LT) addressed me over the radio with female pronouns and I heard officers laughing down the hall from me about this public/ widespread humiliation. (As everyone in the institution can hear what is being said via radio.) I approached him in the Food Service Directors office (Kitchen) Mrs. Gunter was present. I stated to him "I'm not going to argue with you, but I would appreciate it if you would not embarrass me on the radio like that again." As I left out of the office I heard him state something to Mrs Gunter and begin to laugh obnoxiously loud.

### June 18th, 2019

I spoke to HR assistant Tracy Gay reiterating my concerns of harassment in the workplace. I reported harassment I was receiving from OFC Lovett and OFC Kemp. They both mis gendered me around new employees (in front of me and over the radio) and smiled at me after. After count in G building and in main control. I was told to follow up with her later that day and she would speak to the Warden. Later that day I was advised to wait in the lobby and that a meeting with the Warden would be able to happen that day. While waiting in the lobby for the meeting to take place I was approached by Captain Gay and advised that I would be moved to night shift starting June 21st. I feel this was retaliation for reporting my issues. Once in the meeting I addressed my concerns about harassment and officers disclosing my private/confidential information non-consensually to numerous individuals in the workplace. It is negligent, irresponsible, dangerous and abusive. I gave examples about what was being said. I was told that if it continues "we will just have to take their pay", by the warden.

### June 21st, 2019 @1630

I started night shift. Lt Dickson and the main control operator OFC Nelson. Would constantly harass, mis gender me and taunt me. Lt Dickson called me "baby girl" on a couple of occasions. I also had issues with OFC Lockhart constantly calling me "Mam." While on this shift Lt Dickson would often take call ins and not require a drs note nor documentation for why they missed work. On one occasion he let an Officer leave work and miss the next day because she complained of high blood pressure. No Drs note needed.

### June 26th, 2019

I advised Captain Gay that I had a Dr appointment on Friday morning and asked if there might be someone to fill in for me so I could leave early. He stated, "you don't need to leave early that's why you have the weekend off" (To recover). When I advised LT Dickson that I had a dr appointment on Friday morning and that I would have to leave work early as I just switched to night shift and I was unable to reschedule my Dr appointments which had been scheduled for months in advance. He told me he would let me leave on June 27th and 2330 Hrs.

### June 28th, 2019 @0200 Hrs.

I was told I would get to leave early for my Dr appointment Friday morning and I would be off by 2330 June 27th (Thursday). I wasn't permitted by Lt Dickson to leave until the above date and time. (June 28 @0200) My appointment was at 0800 Hrs and it was a 2 Hr drive there.

### July 8th, 2019 @ approximately 0600 Hrs.

I approached LT Dickson in front of LT Miller and advised him I would be unable to report on July 10th and 11th due to Drs appointments. I also reassured him that I would have documentation for why I was out of work. He stated okay and walked away from me.

### July 9th, 2019

I received a phone call from LT Dickson asking when and where my appointments were. He then demanded that I come into work and he would let me leave early. I stated I wasn't going to be able to come in because of the 3 hr drive one way to my appointment.

### July 15th 2019 @1840 Hrs.

Lt Dickson asked me for a statement about why I didn't report to work on July 10th. I provided 2 drs notes.

### July 16th, 2019

LT Lyles is assigned to the shift. LT Dickson transfers to Smith State Prison. New Sergeant on shift SGT Todd. Main control OFC Nelson trains OFC S. Williams to take her place.

### July 23rd, 2019 @1045 Hrs.

I received a write up for not going to work on July 10th from Captain Gay. Box #6 is signed off by the Americans with disabilities act coordinator (ADA) for the institution. Box 7 is signed off by the Deputy Warden of Security and Box 8 is signed by the warden. See Document attached.

### July 24th, 2019 @ 0632 Hrs

Captain Gay, Lieutenant Lyles, Officer Duran, Officer Reid and I were gathered in Main Control when Captain Gay Stated to Lieutenant Lyles "Hey I need you to have 2 of your sergeants to stay and assist first shift with the first phase movement." Lt Lyles stated that SGT Copeland and SGT Simmons (female) would stay after and assist. The Captain replied, "that's a little sexist don't you think?" and chuckled. He later apologized for making that comment.

### August 7th, 2019 @1830 Hrs.

In H Control while I was about to conduct count I asked Officer Walters if she had a scrap piece of paper I could use to write with. She stated "yes, here you go", handed me the paper and stated "gotta help a sister out." I asked "Who? Me? I gotta help a sister out?" She replied "No. Me. I helped a sister out." I replied "I'm not a sister. I don't know who your talking to like that but I'm not your sister."

### August 7<sup>th,</sup> 2019 @2145 Hrs.

I went to B Building to assist Officer Nelson with count procedures. Lt Lyles had dropped off Disciplinary Reports for Officer Nelson to Sign and Serve to offenders earlier that night. As I approached B Building Officer Nelson met me outside of the control booth and handed me an incomplete Disciplinary Report that needed to be served. I thought she was handing it to me to hold while she opened the Door to the Dormitory as the doors are quite heavy. After she opened the door and stepped in I handed her the paper back I stated, "here's your DR back." She replied "I'm not serving it. You are. Mam." And proceeded to laugh while looking at me. I stated, "No the hell I'm not." I assisted her with count on the first dormitory and then reported the incident to my supervisor. (Lt Lyles) He spoke with Officer Nelson and instructed her to serve the DR, she complied.

### August 8th, 2019 @ 1600 Hrs

I reported early to work because I was advised by the personnel manager that there would be a meeting at 4pm regarding my write up that I received on JULY 23 with the Warden. I was told it would be reconsidered and possibly taken out of my file. When I arrived, I met Mrs. Johnson (personnel manager) in the lobby and stated, "I'm here for the meeting". She replied "oh, I got with the Warden and he wants

you to bring it up the chain of command" the Warden walks through the lobby and reiterated what she just told me. "Get with Deputy Warden McFarlane". By policy any accusation of sexual harassment/ discrimination should be reported directly to the Warden. Also, any harassment on the basis of ones' gender/sex, falls under sexual harassment per department policy. I attempted to meet with DW McFarlane directly after that and he was busy at the moment. I asked the administration LT Vambrumelen to let the Deputy warden know I would like to speak with him today if he has time before he leaves, he stated "Okay ill let him know". I was not given the opportunity to address the issues because he left and didn't follow up with me.

### @ 0227 Hrs.

After placing restraints on offenders that were transferring from my institution to another, Unit Manager Crapps pulled Sgt Todd, Officer Burt and I into the Control station and began explaining that there were a lot of discrepancies with the restraints not being double locked and we need to ensure that they are all double locked. While stating this he was looking and speaking in only my direction and briefly glanced at the other officers 2-3 times. I stated "I was only responsible for the leg irons and after I placed them on Sgt Todd and Officer Burt made adjustments after I returned my key. I can't account for what someone else did after I returned my key." Mr. Crapps then looked at Sgt Todd and stated, "how did that feel when he just threw you under the bus."

### August 12th, 2019

Upon reporting to work the K9 Unit was in the parking lot and everyone's vehicle was searched. Later that evening I advised LT Lyles that I had a job interview for another institution August 13th @8 and asked if it would be okay if I left a little early. He stated, "yes after the transfers go out." When it was time for the transfers to go out I was instructed to take the offenders to their next institution and was not permitted to leave early. When I returned I asked, "since I didn't get to leave early and it's a couple hour drive to my interview, can I report a little late tonight?" The Lt stated, "no the Captain didn't want me to let you leave early and if you report late ill have to write you up."

### August 19th, 2019 @0430 Hrs.

While completing an incident report in main control officer Nelson called from B building and asked officer S. Williams if the Lieutenant was in there. Officer Williams stated "no." Officer Nelson asked Williams if Sgt Todd was in there. Officer Williams stated "No." Officer Nelson then asked, "well who's in there with you then?" Officer Williams stated, "Sgt Copeland is here." Nelson replied "Oh. I don't wanna talk to THAT!" and hung up the phone. I advised LT Lyles about this incident and the issues I had with her and LT Dickson in the past.

### August 21st, 2019

Sgt Todd was approved to report late. No write up given.

### August 22nd, 2019

I received an email from Captain Gay for the promotional assessment test and my name was taken off the testing list. I was signed up for the test on May 30th. However, I was taken off that list because I

returned to work from medical leave on the 29th and was told "we wanted to give you more time to study so youll be on the next one." -Personnel

### August 23nd, 2019 @0015 Hrs

While entering the front entry I was approached by officer Holland who blocked the doorway, so I couldn't come in and began to verbally threaten me by stating "you know we can fight" then she stated to me "when people call you mam/she and you say, "Don't call me that", that offends me because I'm proud to be a woman." In front of SGT Simmons.

### August 26th, 2019 @ 2017 Hrs.

While exiting the front entry Officer Holland pushed my right shoulder with her left palm as I walked through the front bunker to go on break and Sgt Simmons laughed after she did that. While on break Officer Holland circled the parking lot around my vehicle multiple times with the armed perimeter vehicle, while occasionally staring at me. I was in fear of my life and safety at that time because she was carrying a pistol. I notified my supervisor, the captain, DW of security and the warden by email while in my vehicle.

### August 27th, 2019 @0123 Hrs

I was advised by Unit manager Crapps to go to the front entry and obtain restraints for offenders that were transferring out of the institution and restraint keys. Upon arriving to the front entry Officer Holland was present and I asked her "can I get some transfer keys, please". She didn't say anything or move so I asked again "can I get some restraint keys please". I could see there was one set of restraint keys on the key board. However, she looked at me without looking at the board and stated, "I don't have any keys for you". I stated "okay" and exited the front entry. I notified unit manager Crapps and Lt Lyles that she refused to provide keys and restraints.

### August 28th, 2019

I was contacted by investigator Mosley regarding the incident that took place with Officer Holland. A meeting was scheduled for September 4th @ 1600 Hrs.

### August 30th, 2019

I was advised that I was being reassigned to a different shift (A Key Night shift) by written memo from Captain Gay upon arrival to work. Also, I was advised by an employee that Officer Mobley (new officer) and Officer Bell (rehire) were permitted to go to school while working for Rogers State Prison. On July 28th I emailed the warden asking if it would be possible to arrange my work schedule, so I could finish my degree. He never responded via email. However, when I followed up with him on my next scheduled work day, he stated he spoke with captain Gay and they came to the mutual agreement that they could not allow me to go to school because "we are too short staffed".

### August 30-31st, 2019 morning between 0445-0530

While speaking to Food Service worker Bradford, SGT Bacon proceeded to walk up behind me and slap me on my right shoulder firmly with her right hand. Interrupting my conversation about offender diet snacks for diabetics and cholesterol profiles. (SGT Bacon is friends with Officer Holland.)

**September 3rd, 2019 @2205 Hrs.**

My first night on my new shift, SGT Fryer began to refer to me as "she" and point towards be with in G control when speaking to Officer Simmons. Officer Harris referred to me as "she" in H control when speaking to Officer Gardner. (New Officer)

**September 4th, 2019 @1600 Hrs**

I met with Investigator Mosley regarding the incident that took place with Officer Holland. I feel like the interview was not about the incident but rather finding a way to get me to incriminate myself and victim blame. My best interest was not in mind based on the tone of the interview. After the interview she initiated text with me requesting a screenshot of a facebook post. See messages attached.